[No. S004485. Crim. No. 22911. June 26, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ALLEN HAMILTON, Defendant and Appellant.

1148

1150

**COUNSEL**

Betty L. Dawson, under appointment by the Supreme Court, for Defendant and Appellant.

Frank O. Bell, Jr., State Public Defender, George L. Schraer, Deputy State Public Defender, and Michael G. Millman as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Eddie T. Keller, J. Robert Jibson and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—Defendant Michael Hamilton was convicted of the first degree murder of his wife, Gwendolyn Hamilton, and of their unborn child. The jury found that defendant personally used a firearm in both murders. With respect to the murder of Gwendolyn Hamilton, the jury found two special circumstances: intentional murder for financial gain (Pen. Code, § 190.2, subd. (a)(1))[1] and multiple murder (§ 190.2, subd. (a)(3)). With respect to the murder of the fetus, it found the special circumstance of multiple murder. This automatic appeal arises under the 1978 death penalty law. We will set aside one of the multiple-murder special-circumstance findings, but will otherwise affirm the judgment in full.

### 1. SUMMARY OF EVIDENCE AND PROCEEDINGS

Since the evidence at trial was largely undisputed, we present the account of events in narrative form, without reviewing separately the testimony of each witness.

In 1981, defendant lived in Bakersfield with his wife Gwendolyn and their four young children. Gwendolyn was pregnant, and expecting a fifth child about the end of the year.

---

[1] Unless otherwise noted, all statutory citations are to the Penal Code.

In March of 1981 the Hamiltons purchased life insurance policies, with a coverage of $175,000 on defendant and $100,000 on his wife. They experienced some difficulty paying premiums, and in June the agent went personally to collect the quarterly premium extending the policy through September. Receiving no further payment, the agent visited the Hamilton residence again on October 17, and collected two months' premiums from Gwendolyn, extending the policies into November.

In September, defendant began an extramarital relationship with Brenda Burns. In early October he called his sister Carolyn Hamilton to ask if she knew anyone who would do something illegal for money. Later he told her he wanted someone to kill his wife; that "he had a girlfriend and . . . wanted to leave his wife" but "if he just divorced her he couldn't get the kids." He offered Carolyn $20,000 from the insurance on Gwendolyn's life if she would help find someone to do the killing.

Carolyn first asked another sister, Victoria Hamilton, who agreed to kill Gwendolyn for $10,000 of the insurance money, but Victoria moved to Texas a few days later. Carolyn then approached Gilbert Garay, whom she had met when both worked as security guards with the Porterville Private Patrol. Gilbert agreed to help for $10,000.

On October 31, defendant and Brenda Burns went to the K-Mart store in Bakersfield to purchase a single-shot 12-gauge shotgun. Defendant said he left his identification in the car, so Brenda purchased the gun with money furnished by defendant. Defendant kept the gun, and purchased shells.

That evening defendant, his wife, and their children drove to Porterville to visit defendant's parents, Sam and Jacqueline Piper. Carolyn and Gilbert joined them. While accompanying the children on trick-or-treat rounds, defendant, Carolyn and Gilbert discussed plans for the murder.

As arranged, defendant started to drive his family home, but stopped the car by the highway, claiming that one tire was flat. Carolyn left a few minutes later in her truck, accompanied by Gilbert with the shotgun. According to the plan, defendant would crouch by the tire, with Gwendolyn standing beside him holding a flashlight. As Carolyn drove by, Gilbert was to shoot Gwendolyn. But although the truck made four or five passes, Gilbert never pulled the trigger, and he and Carolyn eventually returned to Porterville.

Defendant phoned Carolyn an hour later to ask why she and Gilbert had failed to kill Gwendolyn. The next day he phoned again to say that he and Gwendolyn would stop at the same point on the highway on the pretext

that defendant lost his wallet while changing the tire. Carolyn and Gilbert should drive by and shoot Gwendolyn as previously planned.

That evening defendant and his family again visited the Pipers in Porterville. During dinner defendant mentioned losing his wallet. After dinner defendant drove back to the agreed place, and he and Gwendolyn got out to look for the "lost" wallet. Carolyn and Gilbert drove by several times, but again Gilbert did not shoot.

The following day defendant called Carolyn with a new plan. As part of this plan, Carolyn called Gwendolyn and said that defendant's wallet had been found. Defendant and his wife left their children with Gwendolyn's sister in Bakersfield, and drove in a white pickup truck to Porterville. When they arrived defendant surreptitiously gave Carolyn the wallet, which she then returned to him in front of the family.

This time everything went according to plan. Carolyn gave defendant an icepick, which he used to jab a hole in one of the pickup's tires. Defendant stopped the pickup along the highway because one tire was going flat. Since the pickup had no jack, he left Gwendolyn in the truck and walked along the highway, ostensibly to find a place where he could phone for help. Carolyn and Gilbert picked him up in Carolyn's truck and drove him to a phone booth, where defendant called his mother and asked her to bring a jack. Mrs. Piper said she could not come until Carolyn returned with the truck. Carolyn and Gilbert then drove defendant back to the place where Gwendolyn was waiting in the pickup. Defendant took the shotgun, walked over to the pickup, and shot Gwendolyn in the throat. He returned to the truck and demanded another shell from Carolyn. After reloading he went back to the pickup and shot Gwendolyn again.

Gilbert drove back to the phone booth where defendant got out. Defendant phoned his mother again to ask her to bring a soft drink. Carolyn returned home with the truck. Defendant's parents then drove the truck to the phone booth, picked up defendant, and drove to the pickup where defendant "discovered" that his wife had been killed.

An autopsy revealed the cause of death was shotgun wounds to the throat and chest, fired at close range. The fetus died from anoxia caused by the mother's death.

Defendant first told the police that Gwendolyn had been killed while he was hitchhiking to the phone booth. The next day, however, he said that she was killed by a Canadian whom he refused to identify. The police questioned other members of the Hamilton family, and eventually Victoria told

them of the plan to kill Gwendolyn. With Victoria's consent the police taped a phone call between her and Carolyn. Confronted with the taped conversation, Carolyn and Gilbert confessed. (Carolyn's confession included a statement that "Michael said he wanted the money," a crucial item of evidence supporting the special circumstance of murder for financial gain.) Both Carolyn and Gilbert agreed to a bargained plea of guilty to second degree murder with a dangerous-weapon enhancement, and will serve sentences of 16 years to life. As part of the bargain, both testified against defendant at trial.

The defense at trial attempted to show that Gilbert might have been the actual killer. The clerk who sold the shotgun, recalled by the defense, testified that she did not sell it to Brenda and defendant as she had testified earlier, but to Brenda's sister Sharon, who was accompanied by both defendant and Gilbert.[2] And Victoria testified that when she first talked to Carolyn after the murder, she assumed that Gilbert was the gunman.[3] Defendant did not testify.

The jury found defendant guilty as charged, and found the charged special circumstances—the intentional murder of Gwendolyn for financial gain, and two counts of multiple murder—to be true. The penalty trial was brief. The prosecutor presented documentary evidence that 10 years previously defendant was convicted of grand theft. Defense counsel called Jacqueline Piper, defendant's mother, who testified that as a child defendant had been removed from the family home because of abusive conduct by his father, and placed in a series of foster homes.[4] The jury, after brief deliberation, returned a verdict imposing the death penalty.

## 2. ISSUES ARISING FROM PRETRIAL MOTIONS

### (a) *Motion to recuse the district attorney's office.*

Shortly before the preliminary hearing, defendant phoned the district attorney's office and asked to speak to the district attorney. Defendant said

---

[2] Sharon denied purchasing the shotgun. The form filled out at the time of purchase was signed with Brenda's name, and the prosecutor presented rebuttal testimony that the signature was in Brenda's handwriting.

[3] A defense witness testified that defendant told her that he suspected Victoria and her boyfriend were planning to kill him. Perhaps the most revealing part of that conversation was defendant's statement, "Well, you know my family, if they want anything bad enough, they'll kill for it."

[4] Defendant requested permission to read a statement to the penalty jury in which he said he was not guilty, but that for unspecified reasons beyond his control was not permitted to testify or present exonerating evidence. He then proposed to ask the jury to "return with the penalty described by law for the crime that you have me guilty of." Defense counsel objected, and the court refused to permit defendant to read the statement.

he did not want his counsel to know of the request. The district attorney sent an investigator to talk to defendant. (The conversation itself was not offered into evidence.) The district attorney later informed defense counsel of the conversation.

Defense counsel sought and obtained an order forbidding the prosecution from further contact with his client without counsel's consent. He also moved in municipal court for recusal of the district attorney and filed a complaint against the district attorney with the State Bar.[5] When the case was transferred to the superior court following preliminary hearing, counsel renewed his recusal motion there.

Section 1424 provides that a motion to recuse the district attorney "shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." In arguing the motion, defense counsel stressed not the conversation between defendant and the investigator, but counsel's filing of a complaint with the State Bar. That complaint, counsel suggested, might make the district attorney antagonistic toward defense counsel and his client. A conflict justifying recusal exists whenever "the circumstances of a case evidence a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an even-handed manner." (*People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5].)

The trial court nevertheless denied defendant's motion. Commenting from the bench, the judge said: "Even assuming that there may be some subjective feelings involved that would arise to at least a technical definition of a conflict of interest, I cannot find that such a conflict of interest has been shown in this case as would render it unlikely that the defendant would receive a fair trial. It just doesn't reach to that proportion, so for those reasons your motions are denied."

The question before us is whether substantial evidence supports the trial court finding. (*People v. Conner, supra,* 34 Cal.3d 141, 149; *People v. Lopez* (1984) 155 Cal.App.3d 813, 822 [202 Cal.Rptr. 333].) Defendant presented no evidence of actual antagonism on the part of the district attorney or any

---

[5] The parties debate the merits of defense counsel's complaint with the State Bar. Rules of Professional Conduct, rule 7-103 provides that "[a] member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body." The Attorney General argues that this rule should not be applied to a district attorney performing a public office, but acknowledges dictum in *People v. Manson* (1976) 61 Cal.App.3d 102, 164 [132 Cal.Rptr. 265] to the contrary. It is not necessary for us to resolve this dispute here.

attorney from his office. He points to nothing in the conduct of the case which suggests bias against his client. Under these circumstances the possibility of hidden bias engendered by defense counsel's complaint to the State Bar is insufficient to overturn the trial court's ruling.

Recognizing trial counsel's failure to show a conflict of sufficient magnitude "as would render it unlikely that the defendant would receive a fair trial" (§ 1424), appellate counsel now argues that this portion of section 1424 should not apply when there is an actual, as opposed to a technical, conflict of interest. The statute does not draw the distinction defendant suggests, and one can readily envision cases where there is an actual conflict of interest, but one of such minor character as to render recusal unnecessary. The recusal of an entire prosecutorial office is a serious step, imposing a substantial burden on the People, and the Legislature and courts may reasonably insist upon a showing that such a step is necessary to assure a fair trial.

### (b) Motions for change of venue.

Prior to jury selection defendant moved to change venue from Tulare County. The superior court denied the motion, noting that it could be renewed later. Defendant then renewed the motion both during the voir dire of the jury, and again after the jury was selected, but the trial court denied the motion on both occasions.[6] Defendant now contends that the trial court erred in so ruling.

The principles governing review of venue motions are well settled. "[T]he appellate court must make an independent evaluation of the circumstances surrounding a defendant's claim for change of venue and must satisfy itself de novo that a fair trial is or was obtainable in the county of original venue." (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 577 [174 Cal.Rptr. 701, 629 P.2d 502].) The standard of review was enunciated in *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372]: " 'A motion for change of venue . . . shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. . . . A showing of actual prejudice shall not be required.' "

" '[R]easonable likelihood' denotes a lesser standard of proof than 'more probable than not' " (*Martinez, supra,* 29 Cal.3d at p. 578), and is deter-

---

[6] After the last motion for change of venue was denied, defendant filed a petition for mandamus with the Court of Appeal, which was denied. We granted his petition for hearing but dismissed the matter as moot because trial had begun.

mined by considering several factors: (1) the nature and extent of pretrial publicity, (2) the county's population, (3) the nature and gravity of the offense, (4) the status of the victim and of the accused in the commmunity, and (5) the existence of political overtones in the case. (*Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 588 [194 Cal.Rptr. 492, 668 P.2d 799].) Finally, a posttrial review is retrospective, extending to an examination of what actually occurred at trial, especially the realities of the jury voir dire. (*People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].) We examine each of the relevant factors.

### (1) *The nature and extent of pretrial publicity.*

During the 11 months preceding defendant's trial, the Porterville Recorder, the Visalia Times-Delta and the Tulare Advance-Register[7] collectively published 20 stories about the killing of his wife, some of which reported considerable evidence of defendant's guilt.[8] On balance, however, the publicity was not inflammatory. None of the local newspapers ran editorials about the case (compare *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 290 [95 Cal.Rptr. 798, 486 P.2d 694]), the descriptions of the crime were neither detailed nor graphic (compare *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 950 [187 Cal.Rptr. 455, 654 P.2d 225], Bird, C. J., dis.) nor were they accompanied by photographs of either the crime scene or the victim. None of the reporting depicted defendant as a danger to the general public. (Compare *Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 50-51 [84 Cal.Rptr. 135, 465 P.2d 23].)

Moreover, the coverage was not very extensive for a crime of this magnitude. After the first few weeks following the killing, both the length and the frequency of the articles diminished, and they quickly left the front pages of

---

[7] The 1982 daily circulation figures for these publications are as follows: Porterville Recorder, 13,003; Visalia Times-Delta, 20,137; Tulare Advance-Register, 8,544. (Ayer Directory of Publications (1982 ed.) IMS Press, Publisher.) The population of Tulare County is about 250,000. (Cal. County Fact Book (1980-1981) pp. 16, 23, 25.)

[8] For example, on November 7, 1982, two weeks after the homicide, the Porterville Recorder revealed that defendant's wife had been killed with a shotgun fired at point-blank range, that defendant had had a friend buy a shotgun for him a few days before his wife's death, that despite financial difficulties defendant kept substantial life insurance policies on both himself and his wife, that although one tire was punctured defendant's tire retained sufficient pressure that he could drive to a nearby pay phone, and that the passing motorist who defendant claimed drove him to the telephone had not yet been located. Other articles reported that the victim's fetus had died in her womb, that codefendant Gilbert Garay had been allowed to plead guilty to second degree murder in exchange for testimony against defendant, that defendant had agreed to make "a more complete statement" in return for leniency toward his sister Carolyn, and that defendant had a "woman friend" prior to the killing of his wife. Some papers quoted police characterizations of the crime as a vicious, premeditated murder for profit.

the local newspapers. During November and December of 1981 twelve articles appeared in three publications, while only eight articles were published during the first seven months of 1982. The record contains no evidence of publicity during the two months just preceding jury selection. The majority of the stories appeared in the Porterville Recorder, concentrating coverage in the southern portion of the county (cf. *Odle, supra,* 32 Cal.3d at pp. 941-942) and few articles exceeded 10 column inches in length. In contrast to *Williams, supra,* 34 Cal.3d at pages 589, 591-592 (159 newspaper or radio items in 2 years) and *Martinez, supra,* 29 Cal.3d at pages 578-579 (97 articles in 14 months), this case lacks the kind of persistent and pervasive publicity which would attract and hold the attention of the community. As a result, the coverage in this case did not create a reasonable likelihood that defendant would be deprived of a fair trial.[9]

(2) *The population of Tulare County.*

It is well recognized that in a small rural community "in contrast to a large metropolitan area, a major crime is likely to be embedded in the public consciousness with greater effect and for a longer time." (*Martinez, supra,* 29 Cal.3d at p. 581.) Thus both the size and the character of the county's population, while not determinative, are factors to be considered. Tulare ranks 20th among California's 58 counties in population size, with some 250,000 inhabitants residing in 8 cities and extensive unincorporated areas.[10] The county is largely rural, its economy agricultural. In 1978, 34 willful homicides were reported in Tulare County, as compared to 1,232 in Los Angeles County. (Cal. County Fact Book, *supra,* at pp. 166-167.)

Most recent successful venue cases, however, have involved nonurban counties which had, at the time, substantially smaller populations: *Maine, supra,* 68 Cal.2d 375 (Mendocino County, pop. 51,200); *Fain, supra,* 2 Cal.3d 46 (Stanislaus County, pop. 184,600); *Frazier, supra,* 5 Cal.3d 287 (Santa Cruz County, pop. 123,800); *Martinez, supra,* 29 Cal.3d 574 (Placer County, pop. 106,500); *Williams, supra,* 34 Cal.3d 584 (Placer County, pop. 117,000). Indeed, one appellate court noted over a decade ago, in denying a venue claim in a similar case (capital offense in which media coverage was not found to be sensational), that ". . . Tulare County is not a small community. . . ." (*People* v. *Whalen* (1973) 33 Cal.App.3d 710, 716

---

[9]The defense public opinion poll is inconclusive in this regard. Its accuracy and reliability are belied by an extremely low (38 percent) response rate, and the conflicting testimony of defense and prosecution experts on methodology.

[10]The 8 cities and their 1980 populations are: Dinuba, 10,000; Exeter, 5,400; Farmersville, 5,175; Lindsay, 6,900; Porterville, 19,450; Tulare, 21,550; Visalia, 47,750; Woodlake, 4,250. In 1980 the number of persons living in unincorporated areas was 114,300. (Cal. County Fact Book, *supra,* at p. 23.)

[109 Cal.Rptr. 282].) Thus neither the size nor the character of the population of Tulare County weighs substantially in favor of a change of venue.

 (3) *The nature and gravity of the offense.*

■ In *Martinez, supra,* 29 Cal.3d at page 582, we distinguished the nature of a crime from its gravity: "The peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." Although we have recognized that the gravity of a charge of murder with special circumstances is "a factor weighing heavily in favor of the defendant" (*Williams, supra,* 34 Cal.3d at p. 593), we have clearly rejected the establishment of a presumption in favor of a venue change in all capital cases. (*Odle, supra,* 32 Cal.3d at p. 942.)

■ Defendant was charged with murdering his pregnant wife for profit with a shotgun fired at close range, for which he faced a sentence of death. These circumstances were bound to attract the attention of the press and the public. However, unlike recent cases in which a change of venue has been deemed proper, this case contains none of the elements courts have recognized as peculiarly sensational or inflammatory within the offended community. It involves neither mass murder (cf. *Frazier, supra,* 5 Cal.3d 287, *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872 [101 Cal.Rptr. 411]); nor racial and sexual overtones (cf. *Williams, supra,* 34 Cal.3d 584); nor victims who were popular or prominent members of the community (cf. *Fain, supra,* 2 Cal.3d 46 ["popular athlete"], *Frazier, supra,* ["prominent surgeon and his family"]). Therefore, though the charged murders were repulsive and heinous, their nature and gravity do not weigh compellingly in favor of a venue change.

 (4) *The status of the victim and of the accused in the community.*

 As previously noted, the victim was neither a popular nor a prominent member of the community. In fact, both victim and accused resided in Kern County and were identified in the press as being from Bakersfield. Their only connection with Tulare County was that they had relatives living there. The defendant was not likely to attract community hostility by association with any unpopular subculture (cf. *Frazier, supra,* 5 Cal.3d at p. 294 ["hippies"]) or minority ethnic group (cf. *Williams, supra,* 34 Cal.3d at p. 594 [Black], and *Martinez, supra,* 29 Cal.3d at p. 584 [Hispanic], both in predominantly White, rural Placer County). The publicity surrounding the trial did nothing to vilify or denigrate defendant's status, nor to personalize

the victim. As a result, the jurors do not appear to have had a stake in the outcome of the trial, and the likelihood that defendant was deprived of a fair trial is correspondingly diminished.

(5) *The existence of political overtones.*

Defendant suggests that his attempt to recuse the district attorney (who was then running for reelection) on the grounds of prosecutorial misconduct may have prejudiced the community against him. However, "absent an affirmative showing, a conflict should be found to exist only when both adversaries are in fact the opposing candidates" (*Williams, supra,* 34 Cal.3d at p. 594), as was the case in *Maine, supra,* 68 Cal.2d at pages 386-387. Local news stories related defendant's request for a new prosecutor in a neutral manner, and there is no indication in the record that the story generated any community concern at all, much less hostility.

In sum, despite the disgusting and reprehensible conduct charged against defendant, the case presented no extraordinary potential for prejudice peculiar to the local population. The murder lacked significant political overtones, and was perpetrated by a not particularly memorable White male, in moderate-sized Tulare County. Moreover, the publicity about the crime was not so lengthy, massive, pervasive or sensational as to have a prejudicial effect on potential jurors.

This conclusion is uncontradicted by the results of the actual jury voir dire. Of the twelve jurors who ultimately served, two were totally unaware of the crime prior to trial; three remembered very little except that such a crime had occurred; five recalled some details such as that defendant had been implicated in the roadside killing of his wife; one remembered that Gilbert and defendant's sister had also been implicated; and one had read that defendant's sister had been involved and that "someone" had bought a gun.

Admittedly, most of the jurors had some knowledge of the charges against the defendant. "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].) In *Harris, supra,* 28 Cal.3d at page 950, where eight of the twelve jurors had been exposed to pretrial publicity, we nevertheless held that the realities of voir dire "clearly indicated pretrial publicity did not have the effect of denying defendant his right to a fair and impartial jury."

Similarly here, the jurors demonstrated no knowledge of the most damaging facts reported by the media, or of those which engendered the special circumstance charges. They made no mention of defendant's insurance payments, of his relationship with Brenda Burns, of the victim's pregnancy or of witness agreements to testify against defendant in exchange for reduced charges. In short, the record does not indicate the kind of juror interest or partiality which would support a motion for a change of venue.

(c) *Defendant's request to participate as cocounsel.*

About four months before trial, defendant wrote the superior court to complain about his appointed counsel. Among other matters, his letter asserted that counsel had refused to file a motion to grant defendant cocounsel status and had threatened to withdraw if defendant filed such a motion himself. During a hearing to consider defendant's complaints, both the judge and defense counsel referred to defendant's request to be cocounsel, and defense counsel made clear his opposition to the request. There was no formal motion for cocounsel status, and no ruling.

Two months later defendant requested removal of his appointed counsel. At the hearing on this motion, defendant said: "I have asked for co-counsel status with him and he refuses to make that motion. Says he does not want me to have any kind of co-counsel status whatsoever. That co-counsel status will give me a right to help act on this case like maybe. . . ." The court replied: "Well, he is the one who makes that determination. He can say I'll make the motion in your behalf and let you participate as co-counsel in that case or he can say I want to determine the strategy and the tactics of the trial. That is the right of an attorney in a case." Defendant continued: "Well, you've got the case of Baily v. U.S. 381 Federal 2nd 67."[11] The court: "Well, that is the status of the law in California." Defendant explained that the case he cited "gives the defendant the right to question after his attorney. I mean some of these things are things that I would like to have in this case." The court, however, inquired whether defendant wanted to represent himself. When defendant said he did not, the court reaffirmed its appointment of defense counsel and denied the motion for cocounsel status.

■■■ Defendant urges the trial court erred in concluding it had no discretion to grant him cocounsel status unless a motion to that effect was

---

[11] Defendant was referring to *Bayless* v. *United States* (9th Cir. 1967) 381 F.2d 67, in which "[t]he court . . . appointed counsel but made it clear that this counsel would participate in the trial only to the extent that [the defendant] desired. [The defendant] said that he wanted counsel to fully represent him, except that he himself was to have the right, after his counsel had cross-examined witnesses, to himself further cross-examine them. The court permitted this unusual arrangement." (P. 71.)

presented by defense counsel. We conclude, however, that the trial court proceeded properly for two reasons. First, defendant entirely failed to make the "substantial" showing of justification necessary before the trial court may allow a represented defendant to act as cocounsel. Second, even if otherwise inclined to do so, the court lacked authority to sanction a cocounsel arrangement over professional counsel's opposition.

■ A criminal accused has only two constitutional rights with respect to his legal representation, and they are mutually exclusive. He may choose to be represented by professional counsel, or he may knowingly and intelligently elect to assume his own representation. (E.g., *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) An accused who chooses professional representation, rather than self-representation, has no right to participate as cocounsel. (*People* v. *Moore* (1988) 47 Cal.3d 63, 77-78 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 75 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Mattson* (1959) 51 Cal.2d 777, 796-797 [336 P.2d 937].)

■ Indeed, the court's discretion to authorize such an arrangement is sharply limited. We have consistently held that the court should not do so except "on a substantial showing . . . that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered, or delayed." (*Mattson, supra,* 51 Cal.2d at p. 797; see also, e.g., *Moore, supra,* 47 Cal.3d at p. 78.)

Undesirable tactical conflicts, trial delays, and confusion often arise when a defendant who has chosen professional representation shares legal functions with his attorney. (See, e.g., *United States* v. *Mosely* (6th Cir. 1987) 810 F.2d 93, 98; *United States* v. *Kimmel* (9th Cir. 1982) 672 F.2d 720, 721; *State* v. *Gethers* (1985) 197 Conn. 369, fn. 25 [497 A.2d 408, 422]; *Moore* v. *State* (1978) 83 Wis.2d 285 [265 N.W.2d 540, 546].) We therefore reaffirm that the court should not sanction such an arrangement except upon a "substantial" showing that it will promote justice and judicial efficiency in the particular case. ■ Since defendant entirely failed to make such a "substantial" showing here, there was no basis for exercise of the court's discretion. For this reason alone, defendant's motion was properly denied.[12]

---

[12] Defendant directs our attention to *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]. There the trial court refused to exercise discretion whether to appoint "advisory" counsel for a self-represented defendant, mistakenly believing it had no such discretion. We held the error was reversible per se, since denial of such assistance in the circumstances of that case would have been an abuse of discretion. (Pp. 743-746; but see *People* v. *Crandell* (1988) 46 Cal.3d 833, 862-866 [251 Cal.Rptr. 227, 760 P.2d 423] [opn. of Kaufman, J.].) *Bigelow* is inapposite here. A situation where, as in *Bigelow,* a *self-represented* defendant seeks *limited professional assistance* presents different considerations than

The court's action was also correct for a second, independent reason. ■ When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of "fundamental" personal rights to *counsel's* complete control of defense strategies and tactics. (E.g., *People* v. *Guzman* (1988) 45 Cal.3d 915, 935 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 314 [168 Cal.Rptr. 603, 618 P.2d 149]; *Townsend* v. *Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619]; see *Faretta, supra,* 422 U.S. at p. 812, fn. 8 [45 L.Ed.2d at pp. 568-569].) Since a professionally represented defendant has no right, "fundamental" or otherwise, to act as cocounsel, the decision whether to proceed in that fashion is a matter of tactics for professional counsel to decide. (Compare, e.g., *Brookhart* v. *Janis* (1966) 384 U.S. 1, 7-8 [16 L.Ed.2d 314, 318-319, 86 S.Ct. 1245] [right to plead not guilty]; *People* v. *Frierson* (1985) 39 Cal.3d 803, 812-817 [218 Cal.Rptr. 73, 705 P.2d 396] [right to present guilt-phase defense]; *People* v. *Holmes* (1960) 54 Cal.2d 442, 443-444 [5 Cal.Rptr. 871, 353 P.2d 583] [right to jury trial]; *People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710] [defendant's right to *testify* over his counsel's objections].)

Nor, in general, should an attorney be compelled over his objection to undertake the defense of an accused on terms which undermine the powers normally ascribed to counsel. As we have emphasized, "[t]he court should not appoint counsel . . . to defend an indigent . . . and require of him that in so doing he surrender any of the substantial prerogatives traditionally or by statute attached to his office." (*Mattson, supra,* 51 Cal.2d at p. 793.)

■ For these reasons, a trial court should not grant cocounsel status to a professionally-represented defendant over his counsel's objection. Because defendant's counsel opposed his request in this case, the trial court properly declined to entertain it.

Even if viewed as a motion to substitute a more cooperative attorney (see *People* v. *Marsden* (1970) 2 Cal.3d 118, 124-125 [84 Cal.Rptr. 156, 465 P.2d 44]), defendant's complaint demonstrates no basis for relief. Though given ample opportunity to explain his situation, defendant asserted merely an abstract right to cocounsel status. He made no effort to show that his appointed attorney's objections to a cocounsel arrangement were so ill-founded, or the conflict between client and counsel on the subject so fundamental, that defendant's right to the effective assistance of counsel might be

a situation where, as here, a *professionally-represented* accused seeks his own intervention in a legal role. (See also fn. 14, *post.*)

impaired. (*Moore, supra,* 47 Cal.3d at p. 76; *People* v. *Stankewitz* (1982) 32 Cal.3d 80, 93-94 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476].)[13]

▇▇▇▇▇▇ Nor did defendant attempt to exercise his *Faretta* right to represent himself, perhaps with the assistance of professional counsel.[14]

[13]Theoretically, a defendant who chose professional representation might nonetheless be able to assert on posttrial review that his attorney's refusal to accept him as cocounsel constituted ineffective assistance. Successful claims, however, are likely to be rare. At the outset, the defendant must show that his trial attorney's opposition to a cocounsel arrangement had no reasonable tactical basis. (See, e.g., *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].) Considering the inherent difficulties and dubious benefits of such an arrangement (see text discussion, *ante*), such a showing will be difficult. In any event, a represented defendant has no absolute right to assist as cocounsel even with his attorney's consent (see text discussion, *ante*), and a court's refusal to permit such an arrangement, even if counsel supports it, will rarely be an abuse of discretion (see *Mattson, supra,* 51 Cal.2d at pp. 796-797). Thus, even if professional counsel had no reasonable basis for precluding the defendant's participation, reversal or vacation of the judgment might not be warranted unless the defendant could show a reasonable likelihood that his failure to participate in that role had an adverse effect upon the trial outcome. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-695 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052]; *Fosselman, supra,* 33 Cal.3d at p. 584; see also *Crandell, supra,* 46 Cal.3d at pp. 864-865 [opn. of Kaufman, J.]; compare *Bigelow, supra,* 37 Cal.3d at pp. 744-746.) No such claims or showings are made here.

[14]The cases have loosely used such terms as "cocounsel," "advisory counsel," "standby counsel," and "hybrid representation" to describe a multitude of situations in which both the accused and professional counsel are involved in the presentation of the defense case. As we have indicated, however, there are only two basic categories of representation, though each has permissible variations. The defendant may elect professional representation or self-representation. If he chooses professional representation, he waives tactical control; *counsel* is at all times in charge of the case and bears the responsibility for providing constitutionally effective assistance. Upon a "substantial" showing (*Mattson, supra,* 51 Cal.2d at pp. 796-797), and entirely subject to counsel's consent (see text discussion, *ante*), the court *may* nonetheless permit the accused a limited role as cocounsel. *Even so, professional counsel retains complete control over the extent and nature of the defendant's participation, and of all tactical and procedural decisions.* Of course, the accused is responsible for his own mistakes while acting as cocounsel, unless they are directly traceable to his attorney, since one "cannot . . . complain that the quality of his own [performance] amounted to a denial of 'effective assistance of counsel.' " (*Faretta, supra,* 422 U.S. at p. 835, fn. 46 [45 L.Ed.2d at p. 581]; cf., *People* v. *Doane* (1988) 200 Cal.App.3d 852, 863-864 [246 Cal.Rptr. 366].)

On the other hand, if the accused decides to represent himself under *Faretta, he* assumes primary control of, and responsibility for, his defense. (*McCaskle* v. *Wiggins* (1984) 465 U.S. 168, 176-178 [79 L.Ed.2d 122, 132-133, 104 S.Ct. 944]; *Moore, supra,* 47 Cal.3d at p. 77.) The court *may,* and in a proper case should, appoint counsel to assist in an "advisory" capacity "if and when the accused requests help," or to serve in a "standby" role, "available to represent the accused in the event that termination of the defendant's self-representation is necessary. [Citation.]" (*Faretta, supra,* at p. 835, fn. 46 [45 L.Ed.2d at p. 581]; see *Crandell, supra,* 46 Cal.3d at pp. 861-862 [opn. of Kaufman, J.]; *Bigelow, supra,* 37 Cal.3d at pp. 742-746.) Of course, the court is not foreclosed from permitting a greater role for counsel assisting a *Faretta* defendant, so long as defendant's right to present his case in his own way is not compromised. For example, if the defendant so desires and assisting counsel agrees, the court may allow counsel's limited participation as a trial advocate, where this will serve the interests of justice and efficiency. (See, e.g., *McCaskle, supra,* 465 U.S. at pp. 176-177 [79 L.Ed.2d at p. 132].) On posttrial review, however, a self-represented defendant may only raise those narrow claims of "ineffective assistance" which arise directly from *assisting counsel's* breach of

■ Indeed, despite his disagreement with counsel, defendant expressly stated in response to the court's inquiry that he did not wish self-representation. We find no error.

(d) *Exclusion of non-death-qualified jurors from guilt phase.*

Defendant contends that the exclusion from the guilt phase jury of persons who would automatically vote against the death penalty results in a jury which is both biased and unrepresentative. We rejected these contentions in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301] (right to unbiased jury) and *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267] (right to representative jury). The United States Supreme Court has agreed. (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].) We adhere to these decisions.

(e) *Witherspoon claim.*

Defendant claims prospective juror Rufus Skidmore was improperly excluded for cause under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], since Skidmore did not make it "unmistakably clear" that he would automatically vote against the death penalty regardless of the trial evidence. (P. 522 [20 L.Ed.2d at pp. 784-785].) In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], the United States Supreme Court substantially modified the strict *Witherspoon* standard for excusal of pro-life jurors. ■ Under *Witt,* a juror may be excused for cause if he conveys the " 'definite impression" that his penalty views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (Pp. 424-426 [83 L.Ed.2d at pp. 851-852].)

We have adopted the *Witt* standard. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) But Skidmore's excusal seems proper even under the more stringent *Witherspoon* test. Responding to questions from the trial court, Skidmore first said, "I just never could feel I could vote for a death penalty. [¶] . . . [¶] Just too much crooked work." Asked if he could conceive of a situation in which he could impose the death penalty, Skidmore replied, "If I see the murder." The question was twice rephrased, and Skidmore responded, "That is just about it," and "That is what I am trying to say." Pressed to state whether he meant "there is no other situation, . . . no matter what evidence were presented, that you

the *limited* authority and responsibilities counsel has assumed. (*Faretta* and *Doane,* both *supra.*)

could vote for the death penalty," Skidmore again answered, "I don't believe I could."

Defendant's counsel waived questioning. The prosecutor, Mr. O'Hara, then briefly examined Skidmore as follows: "[¶] BY MR. O'HARA: [¶] Q: Mr. Skidmore, I don't think I could do any better than his Honor, but let me see if I can ask you again. Are you saying that unless you had personally seen the murder, you could never vote for the death penalty? [¶] A: Repeat that again. [¶] Q: Okay. You indicated that, to the judge, that if you didn't see the murder happen with your own eyes, you could never vote for the death penalty. [¶] A: That's right. [¶] Q: Is that your statement? [¶] A: That's my statement. [¶] MR. O'HARA: Okay. Thank you. That's all I have."

Whatever ambiguities one might find in Skidmore's responses to the court, they were eliminated in his answers to the prosecutor. Skidmore made unmistakably clear that he would not vote for the death penalty, regardless of the evidence, unless he was an eyewitness to the murder. Excusal on *Witherspoon* grounds is proper if the juror insists he could not vote for death *in the case before him*. (*Fields, supra,* 35 Cal.3d at pp. 335-337.) We see no basis for defendant's speculation that Skidmore's responses were skewed by misleading questioning and the "tension" of voir dire. Defendant's claim of improper excusal lacks merit.[15]

3. ISSUES ARISING AT THE GUILT TRIAL

(a) *Admissibility of recorded telephone conversation.*

 On November 27, 1981, Victoria Hamilton telephoned her sister Carolyn. Victoria had previously agreed to cooperate with the police investigation, and permitted the police to record the conversation. It included the following passage:

"VICKY: Well, who was driving?

"CAROLYN: Vicky, you don't need to know all that information.

"VICKY: Well, God, Carolyn, you trusted me up to now.

---

[15] Defendant urges that, before excluding venirepersons on the basis of their death penalty views, the trial court should have instructed sua sponte that they had a "civic duty" to subordinate their personal views to the law and their oaths. While *Witherspoon* made clear that a juror was not excludable if he could follow the law despite his views, no case has imposed the obligation of a sua sponte instruction to that effect, and we decline to impose one here.

"CAROLYN: I know. And look what happened. I'm not saying I don't trust you now. But the less you know about all of this the better off.

"VICKY: Well, you told—you told me at first that you were driving and Gilbert did the—

"CAROLYN: No, I never did. No, I never said that.

"VICKY: That day I called you from the bar you did.

"CAROLYN: No, I didn't.

"VICKY: You said Gilbert did the shooting.

"CAROLYN: No, I did not. And he didn't.

"VICKY: Well,—

"CAROLYN: You didn't listen well. 'Cause you're right. I did tell ya. I remember that. I told ya everything. But that's not what I told ya.

"VICKY: It sure is.

"CAROLYN: No, it ain't.

"VICKY: Well, then what did you tell me if that isn't what it was?

"CAROLYN: That Gilbert drove and Michael was the one."

During cross-examination of Carolyn at trial, defense counsel asked her whether she had told Victoria in a telephone conversation that Gilbert did the shooting. Carolyn denied making such a statement. (Counsel also asked Gilbert if he was the actual killer; Gilbert denied the charge.) Later Victoria testified on direct examination that she had "assumed" that Gilbert was the killer because she was to have been the shooter and Gilbert took her place in the plot. The prosecution then introduced over objection a recording of the November 27 telephone conversation.

The court admitted the conversation as a prior consistent statement pursuant to Evidence Code sections 791 and 1236. Section 1236 provides that "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

Evidence Code section 791, in turn, provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

It is clear that defense counsel was impliedly charging that Carolyn's testimony that defendant, not Gilbert, did the shooting was a recent fabrication, influenced by her desire to minimize her role and Gilbert's role in the homicide. The controversy concerns whether the November 27 conversation took place "before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

On November 27, 1981, defendant was under arrest, but Carolyn had consistently denied all involvement with the crime. Conceivably she might have already anticipated arrest and reasoned that her involvement in the murder would appear less if Michael instead of Gilbert were the trigger-man—although this kind of foresight does not appear characteristic of the Hamilton family. The testimony did not explore Carolyn's state of mind at the time of the conversation. Arguably, therefore, the prosecution failed to show that Carolyn's statement was made before the motive for fabrication arose.

Any error in this regard, however, would clearly not be prejudicial. We recognize that Carolyn's statement rebutted defendant's theory that Gilbert fired the fatal shots. But in view of the absence of any evidence to support defendant's theory, we cannot believe the November 27 conversation made a significant difference. Even if it had been excluded, the jury would still have heard the positive testimony of Carolyn and Gilbert that defendant was the actual killer, their unequivocal denial that Gilbert was the killer, and no contrary testimony whatever.

(b) *Guilt phase accomplice instructions.*

Defendant contends that the trial court gave prejudicially incomplete instructions on accomplices and their testimony. The trial court instructed the jury pursuant to section 1111 that "a defendant cannot be found guilty based on the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense." The court also instructed that accomplice testimony is to be viewed with distrust and informed the jury that "an accomplice is one who is subject to prosecution for the identical offense charged

against the defendant on trial." The court then instructed that Carolyn Hamilton and Gilbert Garay were to be considered accomplices as a matter of law, and that the jury should determine whether Victoria Hamilton and Brenda Burns were accomplices. The court denied defendant's request that the jury determine whether Sharon Burns was an accomplice. Defendant contends that the jury should have been told that Victoria was an accomplice as a matter of law and instructed to determine whether Sharon Burns was an accomplice.

 Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony . . . is given." In *People* v. *Hoover* (1974) 12 Cal.3d 875 [117 Cal.Rptr. 672, 528 P.2d 760], we held that to be charged with the identical offense as the defendant "it would be necessary for the witness to be considered a principal under the provisions of [Penal Code] section 31, which includes '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present, have advised and encouraged its commission. . . .'" (P. 879.) Thus, whether Victoria was an accomplice depends on whether she was liable to prosecution for murder. "If the undisputed evidence establishes that a witness is an accomplice, the jury should be so instructed, but if the facts as to complicity are in dispute, the question should be left to the jury." (*People* v. *Santo* (1954) 43 Cal.2d 319, 326 [273 P.2d 249].)

The uncontradicted evidence does not show that Victoria was an accomplice to murder as a matter of law. Carolyn first informed Victoria of defendant's plan to kill his wife in October 1981. Victoria expressed surprise at the plan, but agreed to help Carolyn kill Gwendolyn for $10,000 of the life insurance money and suggested that a shotgun would "probably be the easiest weapon to use." A few days later, however, Victoria moved to Dallas, Texas. When Carolyn called Victoria in Texas, and asked if she intended to return to California to assist in the murder, Victoria agreed to do so although, according to her testimony, she actually had no intention of returning and said she would "mainly to save an argument." Victoria did not return to California to participate in the murder and learned of Gwendolyn's death approximately 10 days after the murder. Carolyn testified that she asked Gilbert to assist in the murder after Victoria moved to Texas.

In sum, Victoria's participation in the plot to murder Gwendolyn was limited to two conversations with Carolyn. Whether these two conversations amounted to aiding and abetting is a matter of factual dispute. In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we determined that to be an aider and abettor as a matter of law an individ-

ual must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (P. 560.) The evidence regarding Victoria's intent is ambiguous. She stated that she would participate in the murder, suggested the appropriate weapon, but then moved to Texas and did not participate. Because her actions are subject to a variety of interpretations her accomplice status was properly left to the jury.[16]

With regard to Sharon Burns, defendant points to testimony of a defense witness that Sharon, not her sister Brenda, was the woman who bought the shotgun used to kill Gwendolyn. The prosecution offered handwriting analysis and the testimony of Sharon and Brenda to establish that Brenda purchased the shotgun. Because who purchased the gun was subject to factual dispute the court probably should have asked the jury to determine whether Sharon was an accomplice. The court's failure to give such instructions, however, is harmless error.

In the first place, it is highly unlikely that the jury would find Sharon to be an accomplice. As we noted earlier, an accomplice must share the criminal intent of the perpetrator, and there is no evidence that Sharon intended the killing of Gwendolyn.

In the second place, the defense argument that Sharon was an accomplice because she bought the murder weapon presents a problem in circular reasoning. The jury could not view her denial of the purchase as the testimony of an accomplice, to be viewed with caution, unless it previously found that she had in fact purchased the gun. Once it made that finding, thus directly rejecting her credibility, an instruction to view her testimony with caution would be of little additional importance.

Finally, even if the jury viewed all Sharon's testimony with caution, little harm would be done to the prosecution case. Sharon testified that defendant told her he was unhappy with his sex life with Gwendolyn and wanted a divorce; considerable evidence supports that testimony. Her discovery of the shotgun shells in Brenda's apartment was not significant in the case. And even if the jury concluded that Sharon bought the gun instead of

---

[16]Defendant contends that the jury should have been instructed that Victoria was an accomplice as a matter of law because she was a coconspirator. The cases have not been careful to distinguish between accomplice status arising from conspiracy and accomplice status arising from aiding and abetting. Assuming a conspirator is necessarily an accomplice, Victoria's actions remain subject to a variety of interpretations (e.g., her departure for Texas may have constituted a withdrawal from the conspiracy; see *People* v. *Cowan* (1940) 38 Cal.App.2d 231, 242 [101 P.2d 125]), so it would have been improper for the trial court to have instructed that she was a coconspirator and therefore an accomplice as a matter of law.

Brenda, that conclusion would do little to detract from the evidence that defendant used it to kill his wife.[17]

(c) *Instructions on fetus murder.*

The trial court instructed that defendant could not be convicted of the murder of his unborn fetus unless the fetus was viable. Combining language from the two Court of Appeal decisions then available on the subject (*People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 487 [142 Cal.Rptr. 830]; *People* v. *Smith* (1976) 59 Cal.App.3d 751, 757 [129 Cal.Rptr. 498]), the court admonished as follows: ". . . you must find beyond a reasonable doubt that the fetus was viable, that is, capable of independent existence or as having attained such form and development of organs as to be normally capable of living outside the uterus. A fetus is deemed viable when it is possible for it to survive the trauma of birth, although with artificial medical aid."

United States Supreme Court decisions have established fetal viability—the "potential for meaningful life"—as the limit on a woman's absolute constitutional right to procure a medical abortion. (E.g., *Roe* v. *Wade* (1973) 410 U.S. 113, 163 [35 L.Ed.2d 147, 182-183, 93 S.Ct. 705].) By analogy to the abortion cases, defendant urges that a fetus is not viable under our murder statute unless "there is a reasonable likelihood of [its] sustained survival outside the womb, with or without artificial support." (See *Colautti* v. *Franklin* (1979) 439 U.S. 379, 388 [58 L.Ed.2d 596, 604-605, 99 S.Ct. 675].)

Under that standard, defendant contends, the trial court's instruction contained a latent but prejudicial ambiguity. He urges the instruction improperly implied that a fetus is viable if it is capable of being born alive, even if it could not have survived for a sustained period outside the mother's womb.[18]

---

[17] The sales clerk testified that when Sharon bought the gun, she was accompanied by both defendant and Gilbert. Other evidence indicates that between the time of the purchase and the killing, both defendant and Gilbert had possession of the shotgun.

Defendant points out that Sharon's purchase of the gun might cast doubt on the truthfulness of Gilbert and Brenda. But there are two fundamental problems with defendant's case which undermine any claim of prejudice. The first, as noted earlier, is that no affirmative testimony supports defendant's theory of Gilbert as the actual killer. The second is that Gilbert had no motive to kill Gwendolyn unless he was hired to do so by defendant, and defendant as the hirer of the killer would still be guilty of murder.

[18] The 1970 amendment extending murder to fetuses (§ 187, subd. (a); Stats. 1970, ch. 1311, § 1, p. 2440) contained no viability proviso. As amended, section 187, subdivision (a) simply defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." The Courts of Appeal have inferred a viability limitation in light of the subsequent abortion cases, which first recognized a woman's constitutional right to terminate her

We need not address the merits of defendant's claim, since the ambiguity he posits cannot have been prejudicial here. Uncontradicted and conclusive evidence established that the likelihood of this fetus's sustained survival was high. Dr. Morrison, the pathologist who performed the autopsy on the murder victims, testified that the fetus weighed 1,050 grams (just under 2½ pounds), and was normal, well-formed, and alive at the time of the mother's death. The fetal weight indicated a gestational age of about seven months.[19] A normal fetus of that weight and age, he said, has a better than 50 percent chance of survival. In Dr. Morrison's opinion, the fetus was "viable," that is, "capable of life outside the mother's womb."

Dr. Rajani, a neonatologist and director of a newborn intensive care unit, testified hypothetically on the basis of photographs of the fetus and Dr. Morrison's description. He said that the fetal weight suggested a pregnancy of seven to seven and one-half months' duration. In his experience, when the fetus weighs between 1,000 and 1,250 grams, the survival rate with proper medical care is 89 percent. (With a weight of 750-1,000 grams, the survival rate is 60 percent.) In Dr. Rajani's opinion, given proper medical care, "the baby would have survived."[20]

Defendant objects to the failure of the doctors to define "survival," but it appears in context that both were speaking of sustained, long-term survival, not of momentary survival. (Dr. Rajani's figures appear to be based upon a successful outcome of treatment in his hospital's neonatal intensive care unit.) Defendant also objects to the use of probability figures on survival rates, maintaining that the only issue is whether this particular fetus was viable. In deciding that issue, however, probability testimony is useful and, in this case, persuasive. The Hamilton fetus was not born and had no chance to demonstrate its capability for survival. The best that a witness can do is to testify whether that fetus, based upon its gestational age, weight and development, would probably have survived. Such testimony is necessarily based upon the medical profession's experience with similar fetuses, and

pregnancy before the fetus becomes viable. (See, e.g., *Smith, supra,* 59 Cal.App.3d at pp. 756-757.)

[19] Gwendolyn's mother and sister testified that she was six and one-half to seven months into her pregnancy at the date of her death.

[20] Defendant calls our attention to a confusing exchange between the prosecutor and Dr. Rajani. The prosecutor asked: "These fetuses are newborn infants who are born at that particular weight level, do they generally live for a period of time before they die?" Dr. Rajani replied: "They could, yes." The exchange makes sense if "these fetuses" refers to the fetuses which do not survive neonatal care, and Dr. Rajani's answer affirms that some of them live for a period of time before dying. But if, as defendant suggests, the question refers to all fetuses within the given weight ranges, the answer is not responsive; since some seven-month fetuses survive to live a normal life span, a doctor would not simply state that such fetuses "could" live for a "period of time before they die."

specific figures as to survival rates are more informative than general statements of opinion.

■ In sum, competent, uncontradicted testimony shows that the Hamilton fetus had attained viability by any accepted test, including the likelihood of sustained life outside the womb. Since no reasonable jury could have found otherwise, any instructional suggestion of a lesser standard of viability was immaterial to the case. For similar reasons, we must also reject defendant's contentions that the evidence of fetus murder was insufficient, and that his motion for acquittal on that count (§ 1118.1) should have been granted.

4. ISSUES RELATING TO THE FINDINGS OF SPECIAL CIRCUMSTANCES

The jury found three special circumstances: one of intentional murder carried out for financial gain (§ 190.2, subd. (a)(1)), and two of multiple murder (§ 190.2, subd. (a)(3)). Most of the special circumstance issues relate to the finding of murder for financial gain and arise because of the relative weakness of the prosecution case on this point. The evidence is clear that the Hamiltons were heavily insured, perhaps unreasonably so, that defendant promised Carolyn $20,000 from the insurance proceeds to arrange for the killing, and that he later offered Brenda $10,000 for her silence. But the only direct evidence that financial gain was among defendant's motives is the extrajudicial statement of Carolyn in her confession to the police that "Michael said that he wanted the money. . . ." Since Carolyn is an accomplice, a finding of financial motive based primarily on her statement raises questions about admissibility, corpus delicti, corroboration of accomplice testimony, and sufficiency of the evidence. We examine these issues in turn.

(a) *Admissibility of the recording of Carolyn's confession.*

At trial, Carolyn testified that defendant told her he wanted his wife killed "[b]ecause he had a girlfriend and he wanted to leave his wife and he wanted his kids. . . . [I]f he just divorced her he couldn't get the kids."

During his cross-examination of Carolyn, defense counsel brought out inconsistencies between her testimony and her prior confession. He claimed that the transcript of her confession was incorrect and played a portion of the tape recording of that confession to the jury. He was right: the transcript was incorrect. The prosecutor then requested that the jury hear the entire tape. Defense counsel did not object and the court granted the request. On the tape Carolyn states: "Michael said that he wanted the money

. . . [a]nd he had a girlfriend." Defendant now asserts that the tape was wrongly admitted into evidence and that defense counsel's failure to object shows incompetency of counsel.

Evidence Code section 356 states that when part of a conversation is given in evidence by one party, "the whole on the same subject may be inquired into by an adverse party." Defendant maintains that "the subject" pursued by defense counsel when he questioned Carolyn regarding the inconsistencies between her taped confession and her testimony at trial was the planning of the murder, not defendant's motive. He therefore argues that Carolyn's statement on the tape that "he wanted the money" was wrongly admitted because it was not part of the same subject.

In the questioning leading up to the playing of the taped confession, defense counsel asked what defendant had told the witness prior to the murder concerning "the details" of the planned crime. Defendant's conversations with Carolyn, however, encompassed motive as well as plan, and counsel's questions draw no clear distinction between the two subjects. In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry. "In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with,* the admission or declaration in evidence. . . ." (*Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 852 [3 Cal.Rptr. 459]; *People* v. *Williams* (1975) 13 Cal.3d 559, 565 [119 Cal.Rptr. 210, 531 P.2d 778]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 536 [30 Cal.Rptr. 538, 381 P.2d 394].) (Italics added.) In the present context, it is clear that defendant's explanation as to why he wanted his wife killed had some connection with the planning of the killing, especially since the motive involved obtaining the insurance money and the planning included using part of that money to pay the actual killer.

We note, moreover, that if the evidence had been excluded under Evidence Code section 356, the prosecutor could have secured its admission by another route. It would only have been necessary for him to recall Carolyn's testimony on direct examination concerning defendant's motive for the killing, and to ask her whether she had given a different version in her confession. If review of the confession failed to refresh her memory and change her trial testimony, the confession could have been introduced as a prior inconsistent statement under Evidence Code section 1235.[21]

---

[21] In view of our conclusion that Carolyn's statement was admissible, we need not consider whether defendant's failure to object to its admission bars him from raising the matter on ap-

(b) *Corpus delicti of the special circumstances.*

The corpus delicti of a crime consists of two elements, the fact of the injury, loss or harm, and the existence of a criminal agency as its cause. (1 Witkin, Cal. Crimes (1963) § 88, p. 84 and cases there cited.) It must be proved independently of the extrajudicial statements of the defendant. (See *People* v. *Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253].)

Defendant seeks to apply this doctrine to the special circumstance of murder for financial gain, contending that the prosecution must prove Gwendolyn was killed "for financial gain" independently of defendant's statement to Carolyn recounted in her confession.

Defendant relies on *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887], which held that to sustain a felony-murder special circumstance, the People must prove the corpus delicti of the underlying felony. *Mattson,* however, was based upon a statutory provision applicable only to a felony-murder special circumstance, the requirement that "[w]henever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." (Former § 190.4 in the 1977 death penalty law; identical language appears in current § 190.4.) The general law, we concluded, included proof of the corpus delicti. *Mattson* did not formulate a corpus delicti for the special circumstance itself; it did not, for example, require proof that the murder occurred during the commission of a felony to be proved independently of defendant's extrajudicial statements. Thus *Mattson* does not stand for the proposition that the elements of a special circumstance must be proved independently of defendant's admissions.

We recently addressed this issue in *People* v. *Howard* (1988) 44 Cal.3d 375, 413-415 [243 Cal.Rptr. 842, 749 P.2d 279]. Relying on two Court of Appeal decisions, *Newberry* v. *Superior Court* (1985) 167 Cal.App.3d 238 [213 Cal.Rptr. 129] and *People* v. *McDermand* (1984) 162 Cal.App.3d 770 [211 Cal.Rptr. 773], we held that the corpus delicti requirement does not apply to special circumstance findings unless those findings require proof of some crime other than the murder in question. In the ordinary case "[t]he People need only establish the corpus of the underlying homicide, after which the extrajudicial statements of the accused may be used to establish not only the degree of the murder, but any special circumstances alleged."

peal. (Cf. *People* v. *Frank* (1985) 38 Cal.3d 711, 729, fn. 3 [214 Cal.Rptr. 801, 700 P.2d 415].) Neither need we consider whether counsel's failure to object denied his client constitutionally effective assistance of counsel.

(*Newberry, supra,* 167 Cal.App.3d 238, 241; see *Howard, supra,* 44 Cal.3d 375, 415; *McDermand, supra,* 162 Cal.App.3d 770, 798.)

The corpus delicti rule originated in the judicial perception of the unreliability of extrajudicial confessions, and in the fear that a defendant, perhaps coerced or mentally deranged (since he has confessed to a crime he did not commit) would be executed for a homicide which never occurred. (See Perkins, Criminal Law (3d ed. 1982) pp. 142-144.) Before reaching the issue of special circumstances, however, the jury has not only determined that a crime has occurred, but that the defendant is the perpetrator. The danger of a conviction when there was no crime cannot arise in this context. We accordingly conclude that the corpus delicti doctrine does not bar proof of the special circumstances charged in this case.

### (c) *Instructions on corroboration of accomplice testimony.*

The jury was instructed that a special circumstance cannot be based on the testimony of an accomplice unless it is corroborated by evidence "tending to connect such defendant with the commission of *the offense.*" Defendant argues that the instruction should have read evidence "tending to connect defendant with the *special circumstance,* " because evidence connecting him with the murder would not corroborate accomplice testimony on a special circumstance.

Section 1111 provides that "[a] *conviction* cannot be had upon the testimony of an accomplice unless it be corroborated. . . ." (Italics added.) Defendant's contention raises the question whether this rule applies to the finding of a special circumstance. Defendant acknowledges that, technically speaking, such a finding is not a "conviction," but he contends that cases have extended the corroboration requirement beyond the strict language of the statute.

Defendant relies on *People* v. *Varnum* (1967) 66 Cal.2d 808, 814-815 [59 Cal.Rptr. 108, 427 P.2d 772], which held that in the penalty phase of a capital trial, the prosecution could not prove an aggravating offense by the uncorroborated testimony of an accomplice. *Varnum,* however, did not impose a general requirement of corroboration; it was limited to evidence showing crimes other than the one charged and proved in the guilt trial, and rested on the rule that evidence of such other crimes must meet the rules of admissibility governing proof of those crimes. (66 Cal.2d at pp. 814-815, citing *People* v. *Purvis* (1961) 56 Cal.2d 93, 97 [13 Cal.Rptr. 801, 362 P.2d 713].)

Our treatment of the corpus delicti requirement in connection with special circumstances presents a close analogy. As we have observed, if the

special circumstance requires proof of some crime other than the charged murder, the prosecution must prove the corpus delicti of that crime. (*Ante,* pp. 1175-1176; *People* v. *Mattson, supra,* 37 Cal.3d 85.) If, however, the special circumstance requires only proof of the defendant's motive for the murder or some other matter which does not constitute a separate criminal offense, proof of the corpus delicti is not required. (*Ante,* pp. 1175-1176; see *People* v. *Howard, supra,* 44 Cal.3d 375, 415; *Newberry* v. *Superior Court, supra,* 167 Cal.App.3d 238; *People* v. *McDermand, supra,* 162 Cal.App.3d 770.)

■ We adopt the same distinction here. When the special circumstance requires proof of some other crime, that crime cannot be proved by the uncorroborated testimony of an accomplice. But when, as here, it requires only proof of the motive for the murder for which defendant has already been convicted, the corroboration requirement of section 1111 does not apply.[22]

We conclude that the court's instruction that accomplice testimony relating to special circumstances could be corroborated by evidence connecting the defendant with "the commission of the offense" did not prejudice defendant. That instruction, while ambiguous, was under any reading more favorable to the defendant than the law required.

(d) *Prosecutorial misstatement of evidence.*

■ In his closing argument at the guilt and special circumstance trial, the prosecutor stated that Carolyn Hamilton "testified on the stand" that the killing was for money and that she "told Vicky [Victoria Hamilton] that [defendant] was going to kill Gwendolyn for the insurance money." Defendant urges that this clear misstatement of the evidence warrants reversal of the financial-gain special circumstance. We disagree. Had defendant's trial counsel made a timely objection, the misstatement could have been brought to the jury's attention and cured by admonition. Because counsel failed to object, defendant is precluded from claiming error now. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

Defendant contends that counsel's failure to object constituted ineffective assistance. However, the failure to object did not result in the withdrawal of a potentially meritorious defense. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Nor does it appear reasonably probable that a determination more favorable to defendant

---

[22] In most such cases, as in this case, the accomplice has given critical testimony proving defendant's guilt and the jury, in finding defendant guilty beyond a reasonable doubt, has presumably found the accomplice a credible witness and her testimony truthful.

would have resulted in the absence of counsel's failing. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

It is clear that Carolyn said defendant said he wanted to kill his wife for the money. That she made this statement to a police detective instead of to her sister, and that it came before the jury through a taped confession instead of direct testimony, do not significantly affect its credibility. Consequently the prosecutor's misstatement—and necessarily defense counsel's failure to object to it—did not prejudicially affect the outcome of the trial.

(e) *Instructions on murder "for financial gain."*

■ The trial court instructed the jury in the statutory language: "The murder was intentional and carried out for financial gain" (§ 190.2, subd. (a)(1)). It did not further define or limit the special circumstance. Defendant contends that the court erred in not instructing specifically that motive is an element of the special circumstance.[23]

We do not, however, perceive any other way in which the jury could reasonably interpret the statutory language. Carried out "for" financial gain implies motive. The term "for" refers to "[t]he cause, motive, or occasion of an act, state or condition. . . . It connotes the end with reference to which anything is, serves, or is done." (Black's Law Dict. (5th ed. 1979) pp. 579-580.) While an instruction on motive would further clarify the matter for the jury, the failure to so instruct sua sponte is not error.

In *People* v. *Bigelow, supra,* 37 Cal.3d 731, we observed that the special circumstance of murder for financial gain under the 1978 law was broad and vague, and that it overlapped the felony-murder special circumstances. We adopted a limiting construction "under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (37 Cal.3d 731, 751.) Our recent decision in *People* v. *Howard, supra,* 44 Cal.3d 375, 409-410, endorsed a broader interpretation of the statute for cases, such as the present case, in which felony murder is not charged. In any event, a murder to obtain the proceeds of a life insurance policy falls within both the narrow *Bigelow* construction and the broader *Howard* construction. Hence, defendant was not prejudiced when the court instructed the jury in the broad and unconfined language of the 1978 law.

---

[23] Defendant also complains that the court instructed the jury that "motive is not an element of the crime charged," but the instructions consistently used the term "crime" to refer to murder, not the special circumstances.

(f) *Fetus murder under the multiple-murder special circumstance.*

Defendant contends that the killing of a viable fetus is not "murder" within the meaning of the multiple-murder special circumstance (§ 190.2, subd. (a)(3)). The State Public Defender has filed an amicus brief supporting this contention. Subsequent to argument in this case, however, this issue was resolved against defendant's contention in *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1237-1241 [249 Cal.Rptr. 71, 756 P.2d 795].

(g) *Excessive multiple-murder special circumstances.*

▮ Defendant correctly contends that the charging, submission, and finding of two separate multiple-murder special circumstances—one for each of the two killings—was error. Such procedures contravene the plain language of the multiple-murder provision (i.e., that "[t]he defendant has *in this proceeding* been convicted of *more than one* offense of murder"; see § 190.2, subd. (a)(3), italics added) and raise constitutional concerns about "artificial inflation" of the risk that the death penalty will be imposed arbitrarily. Accordingly, where more than one murder is charged in a single capital proceeding, only one multiple-murder special circumstance, covering all the homicides, should be alleged and found. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 691 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1150 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115].) It follows that one of the two multiple-murder special-circumstance findings must be set aside.

5. ISSUES ARISING AT THE PENALTY TRIAL

(a) *Accomplice testimony.*

As previously noted, evidence about the circumstances of defendant's crimes—a sentencing factor at the penalty phase (§ 190.3, factor (a))—came primarily from the testimony of defendant's accomplices, Carolyn and Gilbert. ▮ Defendant contends that accomplice testimony is so inherently unreliable that it should never serve as the basis for a death verdict.

We cannot agree. Of course, capital penalty procedures must ensure a high degree of reliability in any determination that death is the appropriate penalty for a particular offense and offender. (See, e.g., *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962, 96 S.Ct. 2978] [plur. opn.].) However, we have concluded that this requirement is adequately served, for purposes of "other crimes" introduced in aggravation at

the penalty phase (see § 190.3, factors (b), (c)), by adherence to the "reasonable doubt" standard generally applicable to criminal convictions. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279].)

Here the jury, applying the strict reasonable-doubt standard, and instructed to view accomplice testimony with caution, had already accepted the amply corroborated testimony of Carolyn and Gilbert in convicting defendant of the charged murders. It would be anomalous to say that accomplice testimony admissible for that purpose was nonetheless incompetent to establish the "circumstances of th[ose] crime[s]" for purposes of the penalty determination. As defendant concedes, no cases from any jurisdiction have applied the "heightened reliability" principle to exclude accomplice testimony from a capital penalty trial. We reject any such view.

Defendant points to our statement in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], that "evidence which is barely reliable enough to justify a civil judgment or a limited commitment is not reliable enough to utilize in determining whether a man should be executed." (P. 771.) *Murtishaw* is inapposite. There we said only that *expert predictions of "future dangerousness,"* while perhaps admissible in *civil* contexts, were too unreliable to inform a capital penalty determination. By contrast, the accomplice testimony at issue here, since independently corroborated, was reliable enough to support a *criminal* conviction under the stringent reasonable-doubt standard. (§ 1111.) We hold its consideration at the penalty phase was therefore proper.

Defendant further objects to the court's failure at the penalty trial to repeat sua sponte the caveat that accomplice testimony is to be viewed with distrust. The court gave such an instruction at the close of the guilt trial, telling the jurors that its instructions applied "to this case." A juror would probably understand the instruction applied to the penalty phase of the case as well. If defendant wanted to eliminate all possibility of misunderstanding, he could have requested that the instruction be repeated at the end of the penalty trial, but the court, having given correct and adequate instructions on the point, had no sua sponte duty to repeat those instructions.

(b) *Consideration of excessive special circumstances.*

As previously noted, the finding of more than one multiple-murder special circumstance was error. Defendant claims the error compromised the penalty judgment, since the jury was thereby encouraged to consider one extra special circumstance as an independent aggravating factor. (See § 190.3, factor (a) ["the circumstances of the [charged] crime[s] . . . *and*

the existence of *any* special circumstances found to be true . . . ," italics added].)

However, the jury knew how many murders were actually committed, and the prosecutor did not exploit the excessive finding. Under these circumstances, there appears no reasonable possibility that the jury gave significant independent aggravating weight to the fact that two multiple-murder special circumstances, rather than one, had been charged and found. Hence, we find no basis for reversal. (*People* v. *Bonin, supra,* 46 Cal.3d at pp. 702-703; *People* v. *Kimble* (1988) 44 Cal.3d 480, 504 [244 Cal.Rptr. 148, 749 P.2d 803]; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1281-1283; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 787-788 [230 Cal.Rptr. 667, 726 P.2d 113].)

(c) *Instructions and argument on the method of determining penalty.*

The trial court instructed the jury in the language of the 1978 death penalty law, without material elaboration. We have recognized that such instructions present a danger that the jury will not realize that its task is to determine whether the death penalty is appropriate, but instead believe it should determine the verdict by an arithmetical process "which calls for a mere mechanical counting of factors on each side of the imaginary 'scale' or the arbitrary assignment of 'weights' to any of them." (*People* v. *Brown* (1985) 40 Cal.3d 512, 541, 545, fn. 19 [220 Cal.Rptr. 637, 709 P.2d 440]; *People* v. *Myers* (1987) 43 Cal.3d 250, 274 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1277.) Thus when such an instruction is given, we look to the entire record to "determine whether, in context, the sentencer may have been misled to defendant's prejudice . . . ." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

 The prosecutor here told the jury that "the law is this: if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death." Numerous cases of this court have concluded that such prosecutorial argument, which simply restates the statutory language, is insufficient to mislead the jury. (See, e.g., *People* v. *Robbins* (1988) 45 Cal.3d 867, 887-888 [248 Cal.Rptr. 172, 755 P.2d 355]; *People* v. *Melton* (1988) 44 Cal.3d 713, 761-762 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Howard, supra,* 44 Cal.3d 375, 434-436, see *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276-1280.)

Defendant also points out that the prosecutor stressed the existence of at least "nine" factors in aggravation and a maximum of "two" in mitigation. The prosecutor's argument, defendant claims, improperly linked this

arithmetic imbalance (which was itself inaccurate; see discussion, *post*) to a suggestion that aggravating *evidence* "outweighed" mitigating. It is of course clear that the jury should not decide the penalty verdict simply by counting the number of factors in each column. (See *Brown, supra,* 40 Cal.3d 512, 542.) But the prosecutor here did not suggest that the jury merely count factors. He told them to "weigh" the factors and to "balance them." It might have been better for him not to emphasize the numerical count,[24] but we see no reasonable possibility that his comment would have led jurors to refrain from weighing the aggravating and mitigating evidence to decide which penalty was appropriate.

 Defendant argues that the trial court erred by failing to instruct, sua sponte, that the jury could consider sympathy and mercy for the defendant when deciding the appropriate penalty. Since the decision in *California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we have consistently rejected that contention. (E.g., *People v. Lucky* (1988) 45 Cal.3d 259, 298 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People v. Miranda, supra,* 44 Cal.3d 57, 102.)

(d) *Instructions and argument relating to character and background evidence.*

 Because this case was tried before *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], the jury was not instructed that factor (k) includes not only circumstances which extenuate the gravity of the crime, but also any other aspect of the defendant's character or background that he offers as a basis for a life sentence. (P. 878, & fn. 10.) We must therefore consider whether, owing to the absence of such an instruction, the jury may have been led to fail to consider defendant's mitigating character and background evidence. As in the preceding section, the focus is largely upon the prosecutor's argument.

Upon concluding his discussion of factor (j) (whether defendant was an accomplice) the prosecutor said, "And another circumstance in aggravation.[25] In K, any other circumstance which extenuates the gravity of the

---

[24] In *People v. Howard, supra,* 44 Cal.3d 375, 436, we noted with approval that the prosecutor properly informed the jury that " 'you don't count the number of items or the factors in mitigation and say that there were three or four or eight or ten and only one in aggravation, or the other way around.' "

[25] Though the prosecutor used the word "aggravation" here, it is clear he meant "mitigation." He had completed his discussion of accomplice status (factor (j)), and was now referring to "another" factor—". . . K, any other circumstance which *extenuates* the gravity of the crime *even though* it is not a legal excuse for the crime. . . ." (Italics added.) He then launched into an argument why the jury should not find mitigation in defendant's difficult childhood. He later stated that the "best [the jury could] do" would be to find two factors in

crime even though it is not a legal excuse for the crime. Now, I would suspect that counsel will argue that testimony that came from his mother Jacqueline Piper that he was taken away from the family for a period of time when he was young. And I'm not trying to be facetious, that is unfortunate. And that happens to so many people in our society. I think anyone sitting here can probably think of something bad that's happened in their childhood. But it's certainly not any justification for a crime as heinous as a crime that we have here today."

Defendant notes the comment that the mitigating evidence is not a "justification" for the crime, connects that to the language of factor (k) which speaks of extenuating the gravity of the crime, and infers that the prosecutor told the jury that evidence which does not "justify" a crime cannot be considered. The People respond that the prosecutor meant only that the defense evidence, although worthy of consideration, was of little weight in light of the circumstances of the crime. We think the latter the more reasonable interpretation.

In any case, the mitigating evidence was presented, and was argued by both parties. If we give defendant every benefit of the doubt, the most the prosecutor did was suggest that the evidence did not come under factor (k). We find no language suggesting that the jury disregard that evidence generally. Without objection, defense counsel vigorously urged that defendant's troubled background had mitigating relevance, even if it "doesn't excuse" the crime. Under these circumstances we find no reasonable possibility the jury was misled to believe it could not consider defendant's mitigating background and character evidence.[26]

(e) *Davenport error.*

The prosecutor based his closing argument on a chart purportedly listing the applicable aggravating and mitigating factors. He described the circumstances of the crime (factor (a)) as an aggravating factor, but the absence of any prior violent acts (factor (b)) as mitigating. He remarked that defendant's prior conviction for grand theft (factor (c)) was an aggravating factor,

---

mitigation; in context, one of these must have been factor (k). The jury cannot have been misled by the inadvertent use of the word "aggravation."

[26] Defendant contends the trial court erred by refusing his proffered instruction that the jury should consider in mitigation the disparate sentences received by Gilbert and Carolyn. We have held that the treatment of accomplices is not a relevant sentencing factor, since it does not bear on the defendant's own conduct, character, and background. (*People* v. *Malone* (1988) 47 Cal.3d 1, 53-54 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310].) Here, of course, the jury understood defendant was the actual killer, and that Gilbert and Carolyn had negotiated sentences of 16 years to life in return for their testimony against defendant.

albeit an insignificant one. Noting the absence of evidence under factors (d) (extreme emotional or mental disturbance), (e) (victim participation or consent), (f) (reasonable belief in moral justification), (g) (duress), (h) (inability to appreciate criminality), and (j) (mere accomplice status), the prosecutor's chart and argument deemed each such factor aggravating. He also urged that defendant's age, 29 at the time of the crimes, was an aggravating element. (See factor (i).) Thus, by the prosecutor's count, the "best [the jury could] do" would be to find nine aggravating factors and two mitigating factors (see discussion, *ante*).

 The parties agree that factors (d), (e), (f), (g), (h), and (j) can only mitigate, and that it was thus improper to argue that the absence of each was a factor in aggravation. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 775; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789-790; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) The People maintain that defendant nonetheless waived the issue by failing to object and seek an admonition. (See *Ghent, supra,* 43 Cal.3d at p. 775; *People* v. *Green, supra,* 27 Cal.3d 1, 27.) However, at least in cases tried before *Davenport, supra,* we have addressed *Davenport* issues and their prejudicial implications despite failure to raise them at trial. (See, e.g., *People* v. *Bonin, supra,* 46 Cal.3d 659, 702; *People* v. *Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135]; *Ghent, supra,* 43 Cal.3d at pp. 775-776; *People* v. *Allen, supra,* 42 Cal.3d at p. 1284.)[27]

 In several recent cases, we have declined to find prejudicial effect from similar mischaracterizations by the prosecutor. If the jury was not misled about its power and duty to determine the "appropriate" penalty by "weighing" the aggravating and mitigating evidence, and was instructed to consider each sentencing factor only if "relevant" or "applicable," we have assumed reasonable jurors would understand how to evaluate the absence of particular mitigating factors.[28] Moreover, where the actual balance of evi-

[27] The rule that failure to object bars appellate review applies only if a timely objection or request for admonition would have cured the harm. (*Green, supra,* at p. 34.) In the present case the trial judge made clear in his ruling on the motion to modify the verdict that he, too, believed the absence of evidence of a mitigating factor rendered that factor aggravating. (See *post*, pp. 1186-1187.) Thus an objection by defense counsel would almost certainly have been overruled, and consequently would have failed to cure the effect of the prosecutor's argument.

[28] The prosecutor may, of course, point out that evidence of particular mitigating factors is lacking. (E.g., *People* v. *Ghent, supra,* 43 Cal.3d 739, 775; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 790.) By the same token, when deciding the "appropriate" penalty, the jury may note such absences in striking the balance between the aggravating and mitigating evidence. Thus, insofar as the prosecutor's argument and chart merely highlighted the contrast between the aggravating factors on which evidence had been presented, on the one hand, and the mitigating factors as to which no evidence was available, on the other, they were not improper.

dence was overwhelmingly in favor of aggravation, we have found no reasonable possibility the prosecutor's improper argument influenced the penalty verdict. (E.g., *Bonin, supra,* 46 Cal.3d at p. 702; *People v. Keenan* (1988) 46 Cal.3d 478, 510 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People v. Brown, supra,* 46 Cal.3d at p. 456; see *People v. Ghent, supra,* 43 Cal.3d at pp. 775-776.)

Here the jury was adequately informed of its sentencing responsibility and of the pertinent sentencing factors (see discussion, *ante*), and it received the standard admonition to consider only "applicable" factors. Moreover, defense counsel vigorously disputed the prosecutor's version of the aggravation-mitigation balance. Without objection, counsel urged that factors on which no evidence had been presented should be "ignored" or were "not an issue." He also reminded the jurors that they had sole power to decide what weight to give each factor, and that any one mitigating factor could justify a life sentence "no matter how many other factors point the other way." Any chance the jury was misled by the prosecutor's argument is thus minimal.

In addition, though other aggravating evidence was not overwhelming, the capital crimes themselves were exceptionally brutal. Defendant planned the shotgun murder of his pregnant wife for reasons of personal convenience and financial gain. With cold-blooded determination, he personally executed his homicidal scheme, at point-blank range, after confederates failed to make good on earlier attempts to assassinate the victim. Defendant knew his wife's death would also kill their unborn fetus and would render their four young children motherless. Though mitigating evidence that defendant suffered a difficult childhood was cause for sympathy, it was unlikely to carry persuasive weight against such a callous and calculated murder. Accordingly, we see no reasonable possibility that the prosecutor's improper argument affected the life-death determination.

We realize the jurors took the prosecutor's chart into the jury room, then returned midway through their four-hour penalty deliberations with a request for "the portion of the instruction [on which] the chart prepared by the District Attorney was prepared[,] . . . ." Without objection, the trial court provided the jury with a copy of the sentencing instructions previously given.

In our view, this incident demonstrates no reasonable possibility that the deliberations were compromised. The written instructions furnished in response to the jurors' request reminded them of their duty to "weigh" the factors and consider only those which were "applicable." Under a reasonable interpretation of these instructions, the chart properly illustrated the relative absence of mitigating evidence. (See fn. 25, *ante,* p. 1182.) Fully half

the jurors' deliberations occurred after they returned to the jury room, suggesting the chart's inaccurate "count" of aggravating and mitigating factors was not immediately dispositive. For these reasons, and considering the great preponderance of aggravating evidence, we remain persuaded that no reversible prejudice exists.

(f) *Cumulative prejudice.*

We have found that only one multiple-murder special circumstance finding should have been available for consideration at the penalty phase, and that the prosecutor improperly characterized the absence of mitigating factors as aggravating. In each separate instance, however, we have found no reasonable possibility the jury was misled or the verdict affected. Defendant urges, however, that the *cumulative* prejudicial effect of these trial flaws warrants reversal. We disagree. For reasons previously advanced, it does not appear reasonably possible that the jury's deliberations were prejudicially affected by the problems identified, singly or in combination.

6. MOTION TO MODIFY PENALTY VERDICT

Section 190.4, subdivision (e), provides that whenever the jury returns a death verdict, the defendant is deemed to have moved for modification of that verdict. The denial of the motion for modification is reviewable on the automatic appeal from the judgment.

In the present case the trial judge read into the record his reasons for denying the motion. Those reasons consisted entirely of his review, item by item, of the 11 statutory factors. He found one factor to be mitigating (the absence of prior violent criminal activity) and the other ten factors to be aggravating, and denied the motion. Among other things, the judge found "no evidence" to "extenuate the gravity of the crime" and thus expressly included factor (k) on the aggravating side of the statutory balance.

Defendant correctly observes that this characterization of the aggravating and mitigating factors was largely erroneous. (See *Davenport* discussion, *ante,* p. 1183 et seq.) He further urges the court's statement that it found no "extenuating" evidence under factor (k) indicates it did not consider the mitigating effect of the character and background evidence presented at trial.

However, any analytical errors in deciding the motion were harmless by any applicable standard. The court's order focused consistently upon the brutal and cold-blooded nature of the capital murders. As noted, the miti-

gating evidence was comparatively weak. The statement of decision makes apparent that the court did not deem the issue of penalty to be a close one. Since on these facts we cannot conclude the court's mistakes prejudiced defendant (see *People* v. *Brown, supra,* 46 Cal.3d 432, 462; cf. *People* v. *Heishman* (1988) 45 Cal.3d 147, 201-203 [246 Cal.Rptr. 673, 753 P.2d 629]), we find no basis for a remand of the modification motion. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 792-794.)

## 7. PROPORTIONALITY REVIEW

Defendant asks us to review his sentence to determine whether it is disproportionate to those of his accomplices and to others imposed in California. Such review is not required by the federal Constitution (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]), but the California Constitution (art. I, § 17) prohibits the imposition of a punishment disproportionate to the defendant's *individual* culpability. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 477-484 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].) In view of defendant's calculated murder of his pregnant wife by shotgun, for reasons of personal gain, his sentence cannot be deemed disproportionate by any applicable standard. (See, e.g., *People* v. *Jennings* (1988) 46 Cal.3d 963, 995 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Karis* (1988) 46 Cal.3d 612, 649-650 [250 Cal.Rptr. 659, 758 P.2d 1189].)

## 8. ENMUND FINDING

The evidence is undisputed that defendant was the actual killer of Gwendolyn, and that he intended to kill her. We so find, thus establishing a degree of culpability sufficient under the Eighth Amendment to permit his execution. (*Tison* v. *Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139-140, 107 S.Ct. 1676]; *Cabana* v. *Bullock* (1986) 474 U.S. 376, 383-388 [88 L.Ed.2d 704, 714-718, 106 S.Ct. 689]; *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].)

## 9. CONCLUSION

The judgment is modified to set aside one of the multiple-murder special-circumstance findings (§ 190.2, subd. (a)(3)). As modified, the judgment is affirmed in full.

Lucas, C. J., Panelli, J., Kaufman, J., and Arguelles, J.,* concurred. Mosk, J., concurred in the judgment.

**BROUSSARD, J.**—I concur in the judgment affirming defendant's conviction for first degree murder and in the special circumstance findings. I dissent from the affirmance of the death penalty.

I.

The trial court's instructions listed the 11 statutory factors of aggravation or mitigation. This statutory list of factors serves a constitutionally imposed function, that of establishing "a 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.'" (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 405-406, 100 S.Ct. 1759], quoting *Furman* v. *Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (White, J., conc.).) To treat absence of a factor which is virtually never present as grounds for imposing the death penalty would defeat that function. As we explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788 [230 Cal.Rptr. 667, 726 P.2d 113], "the purpose of 'aggravating' and 'mitigating' factors is to assess the seriousness of a capital crime in relation to others of the same general character. The mere absence of a mitigating element may weigh against a finding that the instant offense is less serious than 'normal,' and thus especially deserving of mercy, but it does not suggest that the crime is *more* serious than 'normal' and thus especially deserving of death." Consequently, prosecutors "should refrain from arguing to the jury that the very absence of a mitigating factor would constitute an aggravating one to be weighed against the defendant" (*People* v. *Ghent* (1987) 43 Cal.3d 739, 775 [239 Cal.Rptr. 82, 739 P.2d 1250]), for such argument may mislead the jury into a mistaken belief that the case before them, because it lacks various statutory mitigating considerations, is a particularly aggravated murder especially deserving of the death penalty.

In the present case the prosecutor prepared a chart listing all of the statutory aggravating and mitigating factors, and based his closing argument entirely on that chart. He began by reminding the jurors that at voir dire he told them if they found guilt and special circumstances, "you're going to have to weigh aggravating and mitigating circumstances to decide what the penalty was. We didn't really go into the aggravating and mitigating circumstances. I made a chart. That's where they are. [¶] But the law is this: if you conclude that the aggravating circumstances outweigh the miti-

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

gating circumstances, you shall impose the sentence of death. [¶] If, on the other hand, mitigating circumstances outweigh aggravating circumstances or the judge will tell you if they are evenly balanced, you shall impose a sentence of life imprisonment without the possibility of parole."

The prosecutor then reviewed each of the factors. (Pen. Code, § 190.3.) He described the circumstances of the crime as an aggravating factor, but the absence of any prior violent acts as mitigating. He noted the defendant's prior conviction for grand theft was an aggravating factor, albeit an insignificant one.[1] He classified all of the other factors except possibly factor (k) as aggravating,[2] pointing out to the jury the absence of extreme mental or emotional disturbance (factor (d)), the lack of victim participation or consent (factor (e)), the lack of moral justification for the crime (factor (f)), the absence of duress (factor (g)), the absence of evidence that defendant could not appreciate the criminality of his conduct (factor (h)), the maturity of the defendant (age 29 at the time of the crime) (factor (i)), and that defendant was not merely an accomplice (factor (j)).

The prosecutor then concluded his argument in the following language: "The last thing I'm going to say, ladies and gentlemen, is I want you to look at every one of these factors. I want you to balance them. There is [*sic*] eleven factors there. The best you can do is find two factors in mitigation and nine factors in aggravation. Your duty as judges at this time I would submit to you is to weigh the factors in aggravation with the factors in mitigation. There is no doubt the factors in aggravation outweighed those in mitigation by a substantial margin. And I would ask you to come back with a sentence of death because that's the only just sentence for the heinous crime which this defendant committed. Thank you."

In sum, the prosecutor erroneously told the jury that the absence of evidence of a mitigating factor rendered that factor aggravating. Employing

---

[1] Compare *People* v. *Brown* (1985) 40 Cal.3d 512, 542 [220 Cal.Rptr. 637, 709 P2d 440], footnote 13, where we noted that aggravation and mitigation must be considered in the context of a choice between the penalties of death or life imprisonment without possibility of parole. A prior record of only one nonviolent felony is a less serious record than that of most murderers.

[2] Upon concluding his discussion of the factor (j), the prosecutor said, "And another circumstance in aggravation. In K, any other circumstances [*sic*] which extenuates the gravity of the crime even though it is not a legal excuse for the crime. . . ." He went on to assert that defendant's difficult childhood is "certainly not any justification for a crime as heinous as a crime that we have here today." The majority assume that the prosecutor used the word "aggravation" to refer to factor (k), but assert that it was a slip of the tongue, because "it is clear he meant 'mitigation.'" (*Ante,* p. 1182, fn. 25.)

It is not clear to me that the prosecutor meant to say "mitigation." I do not believe we can confidently assert that the prosecutor meant "mitigation" when he said "aggravation," or that the jury so understood him.

this erroneous view of the law, he displayed to the jury a chart showing nine aggravating factors and two mitigating factors, when in fact there was only one strong factor in aggravation (the circumstances of the crime) and another arguably aggravating (a ten-year-old conviction for grand theft). The jurors took this chart into the jury room. Evidently it formed a focal point of their discussion, for midway through their deliberations they returned with a request for "the portion of the instruction [on which] the chart prepared by the District Attorney was prepared." The trial court furnished the jury with a copy of the sentencing instructions previously given, instructions which *did not inform the jurors that the chart was based on an erroneous interpretation of the law.*

The majority recognize that the prosecutor's argument was erroneous (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861]) and was intended to mislead the jury, but "assume" *(ante,* pp. 1181-1182) that he was unsuccessful. We should assume, the majority say, that a jury which has been told to consider each factor only if "relevant" or "applicable" will understand how to evaluate the absence of particular mitigating factors. But as I explained in my concurring opinion in *People* v. *Bonin* (1988) 46 Cal.3d 659, 710-711 [250 Cal.Rptr. 687, 758 P.2d 1217]: "This is nonsense. The vice of *Davenport* error is that it tells the jury that factors are applicable when as a matter of law they are not and that factors are aggravating when as a matter of law they are neutral or mitigating. Nothing in the judge's instructions would dispel such erroneous impressions. The trial judge did not tell the jurors how to determine which factors were applicable, that many factors were inapplicable, or that absence of evidence to support a mitigating factor did not transform it into an applicable aggravating factor. Consequently the prosecutor's erroneous argument would not strike the jury as inconsistent with the instructions. We cannot presume that the jurors rejected a plausible prosecution argument and instead adopted a view advanced by neither court nor counsel. [¶] Indeed the instructions to the jury to consider sentencing factors only 'if applicable,' and to follow the law as stated by the judge, are standard instructions given in all capital cases. To hold that such instructions give rise to a presumption that the jury rejected erroneous prosecution argument would give the prosecutor carte blanche to argue whatever he chose."

Pointing to the aggravating circumstances of the crime and the weakness of the mitigating evidence, the majority conclude that there is no "reasonable possibility" (see *People* v. *Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135]) that the prosecutor's argument affected the verdict. I object to this misuse of the "reasonable possibility" test. This is not the rare case of a murder so heinous that any juror (except one so opposed to capital punishment that he could not serve) would have to

conclude that death was the appropriate punishment. The facts of this case would impel many juries to impose a death penalty, but we know of similar murders, committed in a more brutal fashion, in which defendants did not receive the death penalty. (See *People* v. *Morris* (1987) 192 Cal.App.3d 380 [237 Cal.Rptr. 402] [strangulation murder of sister-in-law for insurance money]; *People* v. *Smith* (1987) 188 Cal.App.3d 1495 [234 Cal.Rptr. 142] [hatchet murder of pregnant woman]; see also *People* v. *Reynolds* (1986) 186 Cal.App.3d 988 [233 Cal.Rptr. 596] [execution-style robbery murder by defendant with extensive criminal record]; *People* v. *Almaraz* (1985) 173 Cal.App.3d 304 [218 Cal.Rptr. 888] [execution-style robbery murder of one victim, attempted murder of another, by defendant with prior manslaughter conviction]; *People* v. *Jackson* (1985) 171 Cal.App.3d 609 [217 Cal.Rptr. 540] [strangulation murder after forcible oral copulation by defendant with eight prior felony convictions].) This is, in short, the kind of case in which the penalty verdict hangs in the balance, and in which it is reasonably possible that the prosecutor's argument, telling the jury to put seven factors that do not belong there on the death side of the scale, improperly tilted the balance.

## II.

Penal Code section 190.4, subdivision (e) provides that whenever the jury returns a death verdict, the defendant is deemed to have moved for modification of that verdict. The denial of the motion for modification is reviewable on the automatic appeal from the judgment.

In the present case the trial judge read into the record his reasons for denying the motion. Those reasons consisted entirely of his review, item by item, of the 11 statutory factors. He found one factor to be mitigating (the absence of prior violent criminal activity) and the other ten factors to be aggravating, and accordingly denied the motion.

In so reasoning, it is clear that the court erred as to at least seven factors. The absence of evidence of extreme mental or emotional disturbance (factor (d)); victim participation (factor (e)); a belief in moral justification (factor (f)); duress (factor (g)); diminished capacity (factor (h)); accomplice status (factor (j)); or circumstances which extenuate the gravity of the crime (factor (k)), cannot transform these factors into aggravating circumstances. (See discussion *ante,* pp. 1188-1189.)

The court's ruling with respect to factor (k) deserves particular attention. That factor encompasses not only circumstances which extenuate the gravity of the crime, but also any other " 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than

death.'" (*People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813].) Since it encompasses only extenuating matters, it cannot be aggravating. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) The prosecutor, in arguing the motion to modify, did not contend otherwise. In its ruling on the motion to modify the verdict, however, the court stated that "[i]n carefully reviewing all of the evidence that was presented, the Court can find no circumstances which extenuate the gravity of the crime and the Court finds that this is a matter in aggravation. . . ." Thus not only did the court err in classifying factor (k) as aggravating, but its reasoning—and the absence of any mention in the ruling of defendant's mitigating background evidence—creates a doubt whether the court considered mitigating evidence which did not, in its view, extenuate the gravity of the crime.

The majority, in finding the judge's erroneous reasoning nonprejudicial, assert that the judge's statement of decision "makes apparent that the court did not deem the issue of penalty to be a close one." (*Ante,* pp. 1186-1187.) What the judge's statement of decision reveals—and all it reveals—is that he thought there were ten aggravating factors and one mitigating factor. There is nothing in the record to show that if the judge had realized there were only two aggravating factors balanced by two mitigating factors, he would have viewed the issue of penalty the same way. I do not think it is proper to look at a ruling, which from beginning to end employs an erroneous process of reasoning, and say in effect that if the judge would go to such lengths to condemn the defendant we can infer that he would reach the same result regardless of the reasoning process. We should not assume, as the majority seem to do, that jurors and judges decide the question of penalty solely on the basis of "gut feelings," and that their decisions are neither the product of, nor influenced by, any structured process for making those decisions.

All those arguments which I advanced to show that the prosecutor's misleading argument compels reversal of the penalty verdict apply to require reversal of the ruling on the motion to modify that verdict. But even if we do not find reversible error in the penalty trial itself, we should still reverse the ruling on the motion to modify. First, as we have noted, the court's erroneous reasoning on the motion to modify encompassed an additional factor, factor (k), which may not have been labeled as aggravating on the prosecutor's chart. Second, in finding no prejudice from the prosecutor's argument, the majority assumed that the jurors would recognize that the various neutral factors the prosecutor labeled as aggravating were really inapplicable. The judge's reasoning in denying the motion to modify, however, is not concealed by the secrecy which veils jury deliberations; we know that he classified all neutral factors as aggravating, and that he based his

decision *entirely* on that classification, without mention of mitigating evidence or discussion of the appropriateness of the death penalty. Finally, a finding of reversible error in the penalty trial compels a new trial which, because the new jury is unfamiliar with the facts of the crime, is frequently as extensive as the original trial. Such a finding on a motion to modify, in contrast, requires only a brief hearing, with minimal expense and delay.

## III.

In summary, the prosecutor advanced an erroneous analysis of the aggravating and mitigating factors. The jury may have based its verdict on that analysis; the judge based his sentencing decision on it. If jury or judge had realized that in terms of the statutory factors this was not a particularly aggravated murder, but one in which the aggravating and mitigating factors were numerically balanced, I think it reasonably possible that defendant would not now be sentenced to die. We should not uphold the death penalty in this case.

Appellant's petition for a rehearing was denied August 17, 1989, and the opinion was modified to read as printed above.