Filed 9/11/23  P. v. Sanchez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LOUIS EDWARD SANCHEZ,<br><br>Defendant and Appellant. | H049940<br>(Santa Cruz County<br>Super. Ct. No. 20CR04169) |

Defendant Louis Edward Sanchez was convicted by jury of three felonies involving the same victim:  rape of an unconscious person, oral copulation of an unconscious person, and sexual penetration of an unconscious person.  Defendant argues on appeal that the prosecution did not establish the corpus delicti of sexual penetration of an unconscious person.  He also contends insufficient evidence supports the sexual penetration and rape convictions.  For the reasons stated here, we will affirm the judgment.

## I.    TRIAL COURT PROCEEDINGS

Defendant was charged by information with rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)); oral copulation of an unconscious person (Pen. Code, § 287, subd. (f)); and sexual penetration of an unconscious person by foreign object (Pen. Code, § 289, subd. (d)).  (Unspecified statutory references are to the Penal Code.)  All counts involved the same victim, whom we will refer to as Jane Doe, consistent with the trial

court proceedings and in the interest of privacy. The following is a summary of the relevant evidence presented at defendant's jury trial.

## A. JANE DOE'S TESTIMONY

Jane Doe was 28 years old at the time of trial in 2022. In September 2020 she lived in a house in Watsonville with her young son. The house was split into two sides, with a shared kitchen and laundry rooms. Doe lived on one side with her son, and Doe's brother lived with his wife and son on the other side.

Doe and her family entertained at the Watsonville house one night in September 2020. Doe's son was not staying at her home that night. People began to arrive around 8:00 p.m. They sat in Doe's brother's dining room, listened to music, took shots of tequila, and sang. Doe drank three or four shots, and part of a hard seltzer drink.

Doe's brother arrived home around 10:00 p.m. and asked everyone to move outside to the back yard. Five or six additional men arrived around the same time, including defendant. Doe knew some of the men, but had not met defendant before that night. Doe continued drinking alcohol while outside, consuming about seven hard seltzers and one mixed drink over the course of the night. She danced with a group of people, which included her friends and defendant. Doe testified that she had friendly interactions with defendant while in the back yard, but she denied flirting with defendant or touching him in a sexual way.

The party wound down, some people left, and others went inside the two sides of the house. Doe decided to cook food for anyone who was hungry. Defendant came into the kitchen and tried to help her cook, but Doe told him to sit down. She asked defendant why he had not left with the person he arrived with, and defendant did not answer the question. Doe offered food to defendant and the others who remained in her side of the house. Doe ate her food in the living room and defendant sat at the same table without eating.

2

Doe told defendant he could sleep in her nephew's room on her brother's side of the house. Doe then went to her bedroom, closed the door, and got ready for bed. She wore a hooded sweatshirt and "[b]ootie short" underwear to bed. At one point Doe retrieved water and a phone charger from the kitchen. Doe's female friend was in the living room; the friend told Doe she found it strange that defendant was sitting in the room watching the female friend and another man. Doe repeated the offer for defendant to sleep in the nephew's room; defendant did not respond. Doe returned to her bedroom, closed the door, and fell asleep. When she woke up coughing she went to the kitchen for water and found defendant there, which surprised her. She did not invite him to her room when she returned to bed.

Doe's next memory was "dreaming, like having a sex dream." She awoke and noticed defendant "standing there with his penis inside [her] vagina." Doe noticed she had been moved so that her feet were on the floor. Defendant was standing between her legs. She was still wearing underwear, but the crotch of the underwear "was off to the side." Doe said, " 'what the fuck,' " pushed him away, and ran out of the room. Defendant "looked shocked like, wow, she woke up." She also told him to "get the fuck out of [her] house." Doe huddled into a ball in the corner of the hallway and felt "[d]ead inside." She felt wetness in her vagina and underwear. Doe never gave defendant permission to kiss, cuddle, or do anything sexual with her. Someone called the police, and an officer interviewed Doe at her house. Doe agreed to undergo a sexual assault forensic exam.

### B. FORENSIC EVIDENCE

A registered nurse testified as an expert in sexual assault forensic exams. She completed a sexual assault exam of Doe within hours after Doe contacted the police. Doe was very anxious. Doe had some redness on the front of her neck, bruising on the front of her legs, and abrasions on the back of her neck and upper back. There was an abrasion and tenderness at the entrance of the vagina (fossa navicularis), redness on the labia

3

minora, and a laceration in the area between the vaginal opening and anus (perineum). The nurse testified that the exam was consistent with Doe's description of the incident, but noted that she could not "speak to the matter of consent versus nonconsent." The examining nurse testified Doe had "vaginal injury that could be caused by penetration," and that the injury was consistent with "vaginal penetration with a penis." The nurse acknowledged on cross-examination that marks of the sort she observed on Doe could result from consensual sex.

The court read the jury a stipulation about DNA testing: Swabs were "collected from [Doe's] sexual assault exam." Testing on those swabs "detected male DNA on the perianal [*sic*] swab on the non-sperm fraction of the vaginal swab, and on the mons swab." "DNA analysis performed on the mons swab ... provides very strong support that [defendant] is a contributor to the DNA mixture detected for the mons swab."

## C. DEFENDANT'S STATEMENTS TO LAW ENFORCEMENT

A Santa Cruz County Sheriff's Sergeant testified that defendant called him later that day, wanting an opportunity to describe what happened. Defendant ultimately met with law enforcement twice before being arrested. Both interviews were recorded, and the recordings were admitted into evidence and played for the jury at trial. The deputy testified that because defendant volunteered to be interviewed and was not under arrest, the deputy did not read defendant his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. At both interviews, the deputy showed defendant the door was unlocked and told defendant he was free to leave at any time.

At the first interview, defendant confirmed that he went to the party at Doe's house. He drank more than 10 beers that day and also drank mixed alcoholic drinks. He talked to Doe periodically during the party, including in the kitchen while she prepared food. As the party wound down, defendant decided to sleep in his truck. He walked through Doe's room to leave the house and noticed she was still awake. She agreed to let

defendant sit down and talk with her. She also agreed to let him sleep in the room with her, and agreed to cuddle with him. They fell asleep cuddling.

Defendant provided several summaries of what happened when he woke up, which were largely consistent with one another. He "started touching her, rubbing it a little bit." They kissed. He kissed her breasts and then gave "her the oral sex." She moaned and moved her body in a way that made defendant think she was enjoying herself. Then he "barely sticked it in and she just ... ran out of the room." He later confirmed he was referring to his penis. Doe yelled " 'Get the fuck outta my house. Get the fuck outta my house.' "

During the second interview, defendant repeated that he never forced himself on her. He stated, "if she was asleep then that was my mistake thinking she was awake." An officer told defendant the results of Doe's medical exam indicated "it wasn't just the tip like you explained it." Defendant stated that he "was playing with her for a while." The officer asked, "So with your fingers?" Defendant responded, "That's what I said, probably touch- I was touching her at the beginning. And that's why I thought it was okay, 'cause I was touching her and I was feeling her." Defendant was arrested at the end of the second interview.

### D. DEFENDANT'S TRIAL TESTIMONY

Defendant confirmed at trial that he attended the party in September 2020. He drank beer before the party, and continued drinking beer at the party. He also drank mixed whiskey drinks offered to him by Doe. He smoked cigarettes with Doe. He also danced and talked with Doe during the party. The party eventually died down, and the remaining guests moved inside.

Defendant testified that he kept Doe company in the kitchen while she cooked for the remaining guests. She made him a gordita, but he did not eat it because eating while drinking alcohol gives him nausea. He sat with her while she ate, and Doe eventually went to her bedroom.

5

Defendant testified that he decided to leave, and walked to Doe's bedroom because "that's the only exit [he] could remember coming in through." Defendant also acknowledged he "was going to see if maybe [he] can hookup with [Doe]." Doe was looking at her phone, and she agreed to let defendant sit next to her. Defendant asked if he could spend the night, and Doe agreed. Defendant then asked Doe if she wanted to cuddle, she again agreed, and they fell asleep while cuddling.

Defendant woke up later and noticed "a little bit of light" outside. He kissed Doe and she kissed him back. They started "feeling each other." He was "grabbing her butt and she grabbed me a little bit, you know, my penis and stuff like that and we were just making out." Defendant kissed Doe's neck and breasts, and gave her oral sex. She was moaning and moving her body. Defendant then put his penis into Doe's vagina. He "barely start[ed]" inserting his penis and Doe said, "what the fuck," backed away, and ran out of the room. Doe became "really angry" and screamed at defendant to leave. Defendant left the house.

On cross-examination, the prosecutor summarized defendant's testimony and then stated, "You left out when you penetrated her with your fingers. When did that happen?" Defendant responded, "Maybe after a little bit of awhile that we were making out and I was kissing her and kissing her breasts and started touching her. Probably a little bit before I started giving her oral sex." The prosecutor asked, "When you put your fingers inside of her vagina, did you move her underwear?" Defendant responded, "I think I just put my hand under her underwear." When the prosecutor asked, "So it wasn't through her underwear?" defendant responded, "No." Defendant acknowledged that he never received affirmative consent to engage in any sex acts with Doe.

## E. VERDICT AND SENTENCING

The jury found defendant guilty as charged. He was sentenced to the low term of three years in prison for the rape count (§ 261, subd. (a)(4)). The court imposed concurrent terms for the other two counts.

## II. DISCUSSION

### A. THE CORPUS DELICTI OF SEXUAL PENETRATION BY A FOREIGN OBJECT WAS ESTABLISHED

Defendant moved for a judgment of acquittal (§ 1118.1) near the end of the prosecution's case, arguing the prosecution had not established the corpus delicti of sexual penetration by a foreign object. The court denied the motion based on the "strong corroborating evidence as to two of the three acts."

"The corpus delicti of a crime consists of two elements, the fact of the injury, loss or harm, and the existence of a criminal agency as its cause." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1175.) The prosecution must establish the corpus delicti independent of any extrajudicial statements, confessions, or admissions of the defendant. (*People v. Jones* (1998) 17 Cal.4th 279, 301.) The "amount of independent proof of a crime required for this purpose is quite small," and may consist of circumstantial evidence. Our Supreme Court has described the quantum of evidence as " 'slight' " or " 'minimal.' " The prosecution must make a prima facie showing to permit a reasonable inference that a crime has been committed. (*Ibid.*)

Doe's forensic exam showed an abrasion and tenderness at the entrance of the vagina and redness on the labia minora. The examining nurse opined that Doe's vaginal injury "could be caused by penetration." There was "very strong support" that defendant was a contributor to the DNA mixture found on Doe's mons swab. The foregoing circumstantial evidence permits a reasonable inference of digital penetration, and therefore established the corpus delicti of sexual penetration by a foreign object.

Defendant argues his "admission to digital penetration was, in stark contrast to his admission to intercourse and oral copulation, instigated by the Government, both during his police interview and at trial." During his first police interview defendant said he "started touching her, rubbing it a little bit;" during the second interview, defendant stated he "was playing with her for a while" in response to the officer suggesting Doe's

7

medical exam showed that "it wasn't just the tip like you explained it." We acknowledge that defendant did not specifically refer to his fingers in either interview, but that can be fairly inferred from his statements. Indeed, when the officer asked the clarifying question, "So with your fingers?" defendant confirmed, "*That's what I said*, probably touch- I was touching her at the beginning. And that's why I thought it was okay, 'cause I was touching her and I was feeling her." (Italics added.) We do not view defendant's admission to digital penetration as having been initiated by the interviewing officer.

Defendant contends "the examining nurse explicitly testified the vaginal injuries were consistent with consensual sexual intercourse, not digital penetration." Although the nurse testified the injuries were consistent with "vaginal penetration with a penis," she did not testify that the injury was consistent *only* with penile penetration. Nothing in her testimony forecloses an inference of penetration by something other than defendant's penis.

## B. THE EVIDENCE WAS SUFFICIENT TO SUPPORT SEXUAL PENETRATION BY A FOREIGN OBJECT

Defendant challenges the sufficiency of the evidence supporting his conviction for sexual penetration of an unconscious person by a foreign object. Consistent with section 289, subdivision (d), the jury was instructed that the People were required to prove: "1. The defendant committed an act of sexual penetration with another person; [¶] 2. The penetration was accomplished by using a foreign object; [¶] 3. The other person was unable to resist because she was unconscious of the nature of the act; AND [¶] 4. The defendant knew that the other person was unable to resist because she was unconscious of the nature of the act."

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297,

8

331.) We do not reweigh evidence or second-guess credibility determinations. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) We presume the existence of every fact that the trier of fact could reasonably deduce from the evidence to support the judgment. (*Ibid*.) To overturn a conviction based on insufficient evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Considered with our previous summary of the forensic evidence that was consistent with sexual penetration by a foreign object, defendant's admissions during the police interviews and at trial provide sufficient evidence to support the sexual penetration conviction. At defendant's second police interview, an officer told him the results of Doe's medical exam indicated "it wasn't just the tip like you explained it." Defendant stated that he "was playing with her for a while." The officer asked, "So with your fingers?" Defendant responded, "That's what I said, probably touch- I was touching her at the beginning. And that's why I thought it was okay, 'cause I was touching her and I was feeling her." During defendant's cross-examination at trial, the prosecutor asked, "You left out when you penetrated her with your fingers. When did that happen?" Defendant responded, "Maybe after a little bit of awhile that we were making out and I was kissing her and kissing her breasts and started touching her. Probably a little bit before I started giving her oral sex." The prosecutor then asked, "When you put your fingers inside of her vagina, did you move her underwear?" Defendant responded, "I think I just put my hand under her underwear."

Defendant attempts to minimize the significance of his responses by arguing that his "feeble admission to digital penetration was, unlike his admission to intercourse and oral copulation, suggested by the Government." As we have discussed, we disagree with that characterization. Moreover, in this context the distinction is of no consequence to our review of the sufficiency of the evidence supporting a conviction. Defendant did not

deny the conduct when asked in the interviews and at trial about digital penetration. His own statements provide substantial evidence to support the conviction.

## C. THE EVIDENCE WAS SUFFICIENT TO SUPPORT UNCONSCIOUSNESS

Defendant was convicted of raping an unconscious person. (§ 261, subd. (a)(4).) He contends there was insufficient evidence to support a finding that Doe was unconscious when he penetrated her with his penis. We apply the same standard of review as summarized in the preceding section of this opinion.

Consistent with section 261's definition of unconsciousness, the jury was instructed that a "woman is unconscious of the nature of the act if she is unconscious or asleep or not aware that the act is occurring." Doe testified that she fell asleep in her bedroom alone. Her next memory was "dreaming, like having a sex dream." She awoke to defendant "standing there with his penis inside [her] vagina." Under section 263, "[a]ny sexual penetration, however slight, is sufficient to complete the crime" of rape. The crime was therefore complete as soon as defendant penetrated Doe's vagina with his penis. The jury was entitled to credit Doe's testimony, which provides substantial evidence that she was "unconscious or asleep" (§ 261, subd. (a)(4)(A)) when defendant penetrated her vagina.

Unlike the massage client in *People v. Lyu* (2012) 203 Cal.App.4th 1293 who was awake throughout her encounter with Lyu, Doe testified that she was asleep and awoke only after defendant penetrated her with his penis. Lyu was a masseur who "twice inserted one or two fingers inside [a female client's] vagina" during a massage. (*Id.* at pp. 1295–1296.) The female client immediately hit Lyu and told him to stop. (*Ibid.*) On appeal from a conviction for sexual penetration of an unconscious person, Lyu argued there was insufficient evidence the female client was " 'not aware, knowing, perceiving, or cognizant that the act occurred.' " (*Id.* at p. 1299, quoting § 289, subd. (d)(2).) The appellate court agreed, finding the female client "instantly knew, perceived, and was cognizant that the act occurred." (*Id.* at p. 1301.) In contrast, based on Doe's description

10

of the events, the record here contains substantial evidence to support defendant's conviction for rape of an unconscious person.

### III. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Lie, J.

**H049940**
***People v. Sanchez***